Jose Benedicto MONTECINO, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 89–70008.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1990.

Decided Sept. 28, 1990.

Marvin E. Krakow, Los Angeles, Cal., for petitioner.

John R. Bolton, Asst. Atty. Gen., Civ. Div., Richard M. Evans, Asst. Director, Office of Immigration Litigation, and Alice M. Smith, Office of Immigration Litigation, Washington, D.C., for respondent.

Before BROWNING, NOONAN and FERNANDEZ, Circuit Judges.

NOONAN, Circuit Judge:

Jose Benedicto Montecino–Reyes appeals from the denial from the Board of Immigration Appeals (the Board) of his petition for withholding of deportation and grant of political asylum. We reverse and remand.

## FACTS

Montecino, born on September 4, 1962, was a resident of Canton Caulotillo Jurisdiction El Camon, La Union, El Salvador. In 1982 he served as a soldier in the army of El Salvador. At the end of the year in September 1983—with or without permission, the evidence is ambiguous—he left the army and returned to his parents' home in the small village in which they lived. The day before he got back, at 1:00 A.M. in the morning, there was a knock at his parents' door. The nocturnal visitors were guerrillas, who asked that the door be opened. Montecino's father opened the door. The guerrillas asked for water. They also asked Montecino's parents if they had sons in the army. Montecino knew of men, discharged from the army, who had been killed by guerrillas. Guerrillas regularly patrolled the area on foot, questioning the women of the country about soldiers or ex-soldiers. When Montecino heard of the guerrillas' visit to his home, he concluded that he was in danger and did not stay with his parents but with his aunt. His parents told him to leave the country.

At the deportation hearing he was asked why he left. His answer, as it appears in the record, was as follows:

Because of the reason, they persecute you, and my parents didn't want me to hid (sic) there. Because the tortures they do to you are to much (sic), and my parents wanted to see me alive, so that's why they made the effort to send me over here.

He further testified that he could not have been safe in any other part of El Salvador. As he put it, "They are every place. There isn't any place where they are not at."

Montecino entered the United States on foot in October 1983 without inspection. He was soon apprehended. A hearing on deportability was held in Phoenix, Arizona before Immigration Judge William F. Nail, Jr. on December 9, 1983. The hearing was continued to permit Montecino an opportunity to prepare a petition for asylum. Montecino then moved to join his family in Los Angeles and obtained counsel there. Counsel moved for a change of venue. The motion was denied. The hearing continued before Judge Nail on April 9, 1984. At this hearing Montecino was represented by a lawyer from the Central American Refugee Project. Montecino testified to the facts stated above in regard to his fear of the guerrillas. Leon M. Johnson, Director of the Office of Asylum Affairs, in the Bureau of Human Rights and Humanitarian Affairs of the United States Department of State filed a form letter stating that his office saw no basis for granting asylum.

Judge Nail held there was no evidence that Montecino had been persecuted and no evidence to indicate that he would be persecuted. Judge Nail did not distinguish between the standards for withholding deportation and for denying asylum. Without indicating which petition he was addressing, he simply held, "I must deny the application."

Montecino appealed Judge Nail's "decision" to the Board of Immigration Appeals. The Board recognized that Judge Nail had applied the wrong standard in determining eligibility for asylum. The Board followed its own decision, *Matter of Mogharrabi*, Interim Dec. 3028 (BIA 1987), which holds that eligibility is established by an appli-

cant by showing "that a reasonable person in his circumstances would fear persecution if he were to be returned to his native country." Applying that standard the Board upheld the denial of asylum. The Board further found that the danger from the guerrillas was not "persecution," but "a threat with an entirely rational and strategic purpose behind it." The threat, the Board added, was "a risk of civil war, not a risk of persecution."

The Board did not address Montecino's claim for withholding of deportation, apparently assuming that it somehow dealt with his claim in denying asylum. Montecino appealed to this court on both issues.

## ANALYSIS

*Withholding of deportation.* The Board entered no opinion of any kind as to the withholding of deportation. We cannot review an administrative decision without any rational opinion whatsoever supporting it. Accordingly, this issue must be remanded to the Board for it to act upon Montecino's application.

*Asylum.* The Board held that a threat "with an entirely rational and strategic purpose behind it" did not constitute persecution. This novel doctrine is entitled to the deference an administrative agency should have in defining more precisely a statutory term within its competence. *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 866, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984). However, the deference is limited, and the Board's interpretation must be rejected if it is arbitrary. *Id.* at 844–45, 104 S.Ct. at 2782–83.

Persecutors, whether they are governmental or guerrilla, often have purposes that from their perspectives are "rational and strategic." Communist regimes for example have persecuted capitalists because rationally and strategically from a Communist perspective the capitalists were undesirable. Whether an act is or is not persecution cannot depend on whether it is rational or strategic from the point of view of the persecutors. The Board's definition must be rejected as arbitrary.

The Board, however, went on to say that the risk here was "a risk of civil war." Considered as a new definition, not identical with "the rational and strategic purpose" definition, the Board's position that a risk of civil war cannot amount to persecution also commands deference, but also must be set aside if it is arbitrary. In a civil war persons engaged in military service will be shot at by the other side. But when a person has abandoned military service and is resuming life as a civilian, it is not civil war to kill him. It is an act of barbarism, of terrorism, of persecution. It is the persecution of a member of a distinct group—ex-soldiers—who became the object of harm because their persecutors identify them politically with the government they served.

We are, of course, not laying down the rule that every former soldier of the Salvadoran army may seek asylum in the United States because he has a well-founded fear of persecution. We are holding only that fear of reprisal from guerrillas on the part of an ex-soldier is a type of political persecution and that if such a soldier, on the basis of objective circumstances personally known to him, believes that he has at least a one in ten chance of being killed by the guerrillas, he meets the statutory test of eligibility.

Reference to "objective circumstances" necessarily implies some judgment by the trier of fact as to the reasonableness of the response of fear, because the trier of fact will have to make a judgment as to what objective circumstance could occasion such a response. For example, if the reaction of fear was to a ghost, the trier of fact would hold that there was no objective circumstance or, to express it another way, the reaction of fear was irrational. In this sense, it is not illegitimate for a test of "reasonableness" to enter into the trier of fact's appreciation of the alien's state of mind. But what is an objective circumstance must be determined in the political, social and cultural milieu of the place where the petitioner lived. Reasonableness refers to the reasonable apprehensions and reactions of a particular applicant with a

particular set of political, social and cultural determinants. Attention to the objective circumstance, in any event, should not swallow up the primary focus of the trier of fact on the subjective state of mind of the petitioner. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 431, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987).

Belief is subjective. Fear is subjective. The trier of fact is to determine what this particular petitioner believed and feared in the light of objective circumstances the petitioner encountered.

As the case must be remanded to the Board it is not inappropriate to add some additional observations. Counsel of Montecino's choosing was denied by Judge Nail in denying a change of venue. The lawyer from the refugee project who was assigned Montecino—no doubt because she had a multitude of clients to attend to—seemed remarkably unfamiliar with his case and let him wander through a narration of his military career which had absolutely no relevance to the grounds for his asylum petition. The denial did not amount to a denial of due process or even of the statutory right to counsel; but it seems to have been highly unnecessary to deny Montecino's choice when the process was one that experience indicated would take years and years for the adjudicatory process of the Immigration Service to resolve.

At the trial itself there was a Spanish translator provided by the government. It is hard to know whether the defect in the transcript is due to the translator, the reporter or the typist for the reporter. In any event, the transcript is studded with errors of spelling, grammar and punctuation. The small sample quoted earlier is indicative. On one fairly critical point a word is not reproduced at all but it is said in the transcript to be "indecipherable." The Board in its opinion faithfully followed some of the errors in the transcript, for example reproducing the term "rack" where obviously "rank" must have been intended. The unfortunate effect of these multiple errors is prejudicial to Montecino, not perhaps to the extent of denying him due process of law, but to the extent of making his case considerably less intelligible than it should have been.

The legal quality of the decisions in the case were substandard.[1] Judge Nail was unfamiliar with the statutory difference between the statutes on withholding deportation and granting asylum. The Board invented a new standard that was not responsive to the United States Supreme Court. The Board failed to address one of the two principal claims máde by the petitioner. The whole record is one of a shoddy process. Courts of appeals spend countless hours of consideration on capital cases arising in this country. Here where Congress has provided that a helpless alien does not have to be sent back to face death if he is eligible for asylum, the process as it is revealed in this case is one of haste, carelessness and ineptitude. The State Department, the Board, and the Immigration Service need to improve their standards.

REVERSED AND REMANDED.

---

1. The State Department, whose relevant bureau enjoys a name that indicates a human and humanitarian purpose, instead of providing relevant data within its knowledge of the state of affairs in El Salvador, responded with the kind of perfunctory form letter that might be used by a department store dismissing a customer's mistaken complaint of an overcharge.