**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SELAMAWIT ZEHATYE,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 04-73295

Agency No.
A79-243-418

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
April 3, 2006—San Francisco, California

Filed July 13, 2006

Before: Marsha S. Berzon, Johnnie B. Rawlinson, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan;
Dissent by Judge Berzon

**COUNSEL**

Robert B. Jobe, Law Office of Robert B. Jobe, San Francisco, California, for petitioner Zehatye.

Peter K. Keisler, Assistant Attorney General, Mark Waters, Assistant Director, Lisa M. Arnold, Senior Litigation Counsel, Timothy B. Walthall, Trial Counsel, U.S. Department of Justice, Washington, D.C., for respondent Alberto R. Gonzales.

**OPINION**

CALLAHAN, Circuit Judge:

Petitioner Selamawit Zehatye challenges the Board of Immigration Appeals's ("BIA") denial of her application for asylum and withholding of removal based on her status as a Jehovah's Witness. We affirm.

**I.**

**A.  Zehatye's Arrival in the United States**

Zehatye is a native and citizen of Eritrea, a country located in Northern Africa. After boarding a plane in Kenya and changing flights somewhere in Europe, she ultimately arrived at Dulles International Airport in Northern Virginia on July 13, 2002. She presented herself to immigration officials at the airport and sought asylum, explaining that she was a Jehovah's Witness and feared being "harmed or killed" if forced to return home.

Immigration officials conducted a "credible fear interview," where Zehatye stated that she was "in hiding" because her religion prevented her from "participating in politics." She further explained that she left her country in 1999 and "went to Ethiopia for 2 years," after which she "went to Kenya." She also noted that she could not financially support herself while she lived in Kenya.

The former-Immigration and Naturalization Service ("INS")[1] denied Zehatye's request for asylum and, after a brief deten-

---

[1]As of March 1, 2003, the INS ceased to exist and its enforcement functions were transferred to the Bureau of Immigration and Customs Enforcement within the Department of Homeland Security. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, 2142 (2002), 6 U.S.C. §§ 101-557.

tion, released her on a bond posted by a Mr. Yosief Tesfay. After her release, Zehatye stayed in Northern Virginia with Mr. Tesfay and his wife, Dahab Beyene, who introduced herself to immigration officials as Zehatye's sister-in-law. Soon thereafter, Ms. Beyene's brother, also a Jehovah's Witness, became acquainted with Zehatye and the two became a couple.

In September 2002, the couple moved to San Francisco and were married on December 30, 2002, five months after Zehatye's arrival to the United States.[2] Meanwhile, removal proceedings were underway.

The former-INS filed a Notice to Appear with the immigration court, seeking Zehatye's removal as an arriving alien not in possession of any valid document of entry, travel, identity, or nationality. In response, Zehatye conceded removability as charged and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). On June 6, 2003, a hearing was held before the Immigration Judge ("IJ"), during which Zehatye presented the following evidence.

## B.   Conditions in Eritrea

Zehatye was born in 1974 in Asmara, the capital city of Eritrea which, at the time, was the southernmost region of Ethiopia. In 1993, Eritrea held an internationally monitored referendum in which citizens voted overwhelmingly for independence from Ethiopia. The Eritrean People's Liberation Front led the 30-year war for independence and has controlled the country since that time.

Zehatye testified that she and her family, like most other Jehovah's Witnesses, did not vote in the 1993 referendum.

---

[2]They continue to live in San Francisco, where Zehatye is an active Jehovah's Witness.

Consequently, Jehovah's Witnesses as a group suffered widespread criticism that they were collectively shirking their civic duty. Zehatye claimed that despite her best efforts to avoid such criticism, her name was placed on a "list for not participating in the referendum," and that she and her family "suffered greatly."

Zehatye told the IJ that her father's carpentry business was confiscated and his trade license taken away,[3] and that her family was forced to leave their home and seek shelter with relatives. She testified that she and her five siblings spent their nights "crammed in a single room."

Zehatye was able to complete high school in 1995. In 1998, fighting broke out between Eritrea and Ethiopia along the border, and continued for two years. The Eritrean government responded to the escalating conflict by calling up reserves and increasing the armed forces to approximately 300,000 soldiers. The State Department report indicated that the army resorted to "various forms of extreme physical punishment to force objectors, including some members of Jehovah's Witnesses, to perform military service."

The "Kebele," a governing organization in Zehatye's village, maintained a list of those eligible to serve in the armed forces and in 1999 posted a list that included Zehatye's name. Zehatye testified that authorities gave her one week to prepare to enter the army. She claimed that she fled Eritrea shortly thereafter, because her religious beliefs forbade her serving in the military. She also testified that she believed her life was in danger because she was under constant government surveillance.[4]

---

[3]In 1994, in accordance with a presidential decree, the Eritrean government revoked the trading licenses of some Jehovah's Witnesses and dismissed most of those who worked in the civil service.

[4]Neither Zehatye's testimony nor her declaration in support of the asylum application offer any details regarding the alleged "constant surveillance by government agents."

## II.

The IJ denied Zehatye's asylum claim, finding that she had not established past persecution or a well-founded fear of future persecution. Likewise, he denied withholding of removal on the ground that Zehatye did not demonstrate a clear probability or real likelihood that she would be persecuted if she returned to Eritrea. Additionally, he found no evidence of torture to support a claim for relief under CAT.

The BIA summarily affirmed and Zehatye filed this timely appeal, which challenges only the denial of asylum and withholding of removal.

When the BIA summarily affirms the IJ's decision, we review the IJ's decision as the final agency action. *Kebede v. Ashcroft*, 366 F.3d 808, 809 (9th Cir. 2004). The decision that an alien has not established eligibility for asylum or withholding of removal is reviewed for substantial evidence. *Njuguna v. Ashcroft*, 374 F.3d 765, 769 (9th Cir. 2004). Under the substantial evidence standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). Thus, we must uphold the IJ's determination if it is supported by reasonable, substantial, and probative evidence in the record. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

## III.

### A.  Asylum

[1] Zehatye claims that she is eligible for asylum because she was persecuted in Eritrea on account of her religion.[5] To qualify for asylum, an applicant must demonstrate that he or

---

[5]Since there was no express adverse credibility finding below, we assume that Zehatye's factual contentions are true. *Ladha v. INS*, 215 F.3d 889, 901 (9th Cir. 2000).

she has suffered past persecution or has a well-founded fear of future persecution. 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b). Specifically, an alien is eligible for asylum if he or she

> can show past persecution on account of [race, religion, nationality, membership in a particular social group, or political opinion]. Once past persecution is demonstrated, then fear of future persecution is presumed, and the burden shifts to the government to show, by a preponderance of the evidence, that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution, or the applicant could avoid future persecution by relocating to another part of the applicant's country. An applicant may also qualify for asylum by actually showing a well-founded fear of future persecution, again on account of [one of the five protected grounds].

*Deloso v. Ashcroft*, 393 F.3d 858, 863-64 (9th Cir. 2005) (internal citations and quotation marks omitted).

[2] The IJ's finding that Zehatye failed to establish past persecution or a well-founded fear of future persecution is supported by substantial evidence. The State Department report on Religious Freedom in Eritrea, dated 2002, indicated that there were less than 1500 Jehovah's Witnesses in the country and that under some circumstances, Jehovah's Witnesses are discriminated against, detained and harassed because of their missionary work. Nevertheless, the report notes that there are several Jehovah's Witness churches in Eritrea and members are not barred from meeting in private homes. The report also states that there is no indication that any persons are detained or imprisoned solely because of their religious beliefs or practices, although

> the government has singled out members of Jehovah's Witnesses for harsher treatment than received

by members of other faiths for [refusing to serve in
the military] . . . . The maximum penalty for refusing
to do national service is 3 years. Ministry of Justice
officials have denied that any members of Jehovah's
Witnesses were in detention without charges,
although they acknowledge that some members of
Jehovah's Witnesses and a number of Muslims were
in jail serving sentences for convictions on charges
of evading national service.

U.S. Dep't of State, ERITREA: INTERNATIONAL RELIGIOUS FREE-
DOM REPORT (Oct. 7, 2002) ("2002 Religious Freedom
Report").

### 1. No Compelling Evidence of Past Persecution

Although Zehatye's case evokes sympathy, it does not
compel a finding of past persecution. *See, e.g., Halaim v. INS*,
358 F.3d 1128, 1132 (9th Cir. 2004) (holding that discrimina-
tion against Ukranian sisters on account of Pentecostal Chris-
tian religion did not compel a finding of past persecution);
*Kazlauskas v. INS*, 46 F.3d 902, 907 (9th Cir. 1995) (holding
that harassment and ostracism was not sufficiently atrocious
to support a humanitarian grant of asylum).

**[3]** Zehatye also argues that she was persecuted because
she suffered substantial economic disadvantage when the gov-
ernment seized her father's carpentry business and trade
license, and forced her family to live with relatives. We have
held that substantial economic deprivation that constitutes a
threat to life or freedom can constitute persecution. *See
Baballah v. Ashcroft*, 367 F.3d 1067, 1076 (9th Cir. 2004)
(observing that severe harassment, threats, violence and dis-
crimination made it virtually impossible for Israeli Arab to
earn a living). However, "mere economic disadvantage alone,
does not rise to the level of persecution." *Gormley v. Ashcroft*,
364 F.3d 1172, 1178 (9th Cir. 2004); *see also Ubau-Marenco
v. INS*, 67 F.3d 750, 755 (9th Cir. 1995) (noting that confisca-

tion of entire family business without compensation because of family's political beliefs may not be enough, standing alone, to support finding of economic persecution), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996); *Matter of Acosta*, 19 I. & N. Dec. 211, 222 (BIA 1985) (holding that economic deprivation rises to the level of persecution when it is "so severe that [it] constitutes a threat to an individual's life or freedom"), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987), *overruled on other grounds by Pitcherskaia v. INS*, 118 F.3d 641, 647-48 (9th Cir. 1997). The government's seizure of Zehatye's father's business, while reprehensible, did not threaten Zehatye's life or freedom.[6] Because this evidence does not compel a finding of past persecution, we must uphold the IJ's determination that Zehatye failed to establish past persecution. 8 U.S.C. § 1252(b)(4)(B).

### 2. *No Compelling Evidence Establishing a Well-Founded Fear of Future Persecution*

**[4]** Regardless of the sufficiency of the evidence of past persecution, Zehatye maintains that she is entitled to asylum because she has a well-founded fear of future persecution. A well-founded fear of future persecution must be subjectively genuine and objectively reasonable. *Montecino v. INS*, 915 F.2d 518, 520-21 (9th Cir. 1990).

**[5]** To support her claim, Zehatye points out that during the period since she left Eritrea, the government has leveled civil rights abuses at political dissidents. These abuses, however, were not directed at Jehovah's Witnesses because of their religious beliefs.[7]

---

[6]Zehatye claims that her youngest sister died of pneumonia due to the cramped living conditions that her family endured when they were forced to live with relatives. There is no evidence, however, linking the living conditions or the government's conduct to the sister's illness.

[7]For example, according to various State Department reports, an unknown number of persons were detained without charge because of

**[6]** Zehatye also contends that because she refused to serve in the military, she will be persecuted if she is forced to return to Eritrea. She cites to a State Department report that describes military roadblocks, street-sweeps and house-to-house searches to find deserters and draft evaders. The report states:

> In some instances, authorities arrested and detained for several hours or even days individuals, including pregnant women, children under age 18, and citizens of other countries, who were not subject to national service obligations or had proper documentation showing they had completed or were exempt from national service.

U.S. Dep't of State, Eritrea: Country Reports on Human Rights Practices 2002 (Mar. 31, 2003). The report does not establish, however, that Jehovah's Witnesses were singled out because of their religious beliefs. Moreover, forced conscription or punishment for evasion of military duty generally does not constitute persecution. *See Movsisian v. Ashcroft*, 395 F.3d 1095, 1097 (9th Cir. 2005) (noting that forcing a citizen to serve in the armed forces along with the rest of the country's population does not amount to persecution) (citation omitted).

We disagree with the dissent's suggestion that Zehatye's circumstances fit within the exceptions to this rule recognized in *Canas-Segovia v. INS*, 970 F.2d 599 (9th Cir. 1992), and *Barraza Rivera v. INS*, 913 F.2d 1443 (9th Cir. 1990).

**[7]** The dissent cites our decision in *Canas-Segovia*, 970 F.2d at 601, for the proposition that conscientious objectors

political opinion. *See e.g.*, U.S. Dep't of State, Eritrea: Country Reports on Human Rights Practices 2002 (Mar. 31, 2003); U.S. Dep't of State, Eritrea: Country Reports on Human Rights Practices 2001 (Mar. 4, 2002).

may establish a persecution claim if they can demonstrate that they were selected for mistreatment because of their religious beliefs. There, however, we rejected Canas-Segovia's argument that his refusal to serve in the military (because he was a Jehovah's Witness) was a religious practice for which he was being persecuted. *Id*. We expressly held that "this alone cannot satisfy the requirement of demonstrating his persecutors' motive or intent." *Id*. We granted relief in *Canas-Segovia* on the basis of imputed political opinion — not religion.

Similarly, the dissent's reliance on *Barraza Rivera v. INS*, 913 F.2d at 1450-51, is misplaced. Barraza was ordered by a military officer, under threat of death, to participate in the paid killing of two men. He abandoned military service and fled El Salvador. Barraza testified that he did not want to participate in the assassinations because he believed they were wrong and illegal. *Id*. at 1450, 1452. Indeed, as the court noted, the murders would have been internationally condemned inhumane acts. *Id.* at 1453.

We distinguished *Barraza Rivera* from other "conscientious objector" cases based on the fact that Barraza did not generally oppose military service based on institutionalized practices of the Salvadoran military. Rather, he fled from a terrifying choice that the military forced upon him: murder others, or be murdered himself. *Id*. at 1953 n.14. We held that Barraza had established a well-founded fear of persecution because substantial evidence demonstrated that if returned to El Salvador, Barraza would more likely than not be forced to participate in unconscionable assassinations or be killed for refusing to do so. *Id*. at 1953-54. *See Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1285 (9th Cir. 1984) (holding that a specific, serious threat may establish a well-founded fear of persecution).

Like *Barraza Rivera*, the other cases cited by the dissent require a finding of serious or disproportionate punishment

for refusing to serve in the military in order to qualify for asylum. *See, e.g., Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir. 2004) (serious punishment); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir. 2004) (disproportionately severe punishment); *Matter of A— G—*, 19 I. & N. Dec. 502, 506 (BIA 1987) (same).

**[8]** Zehatye presented no evidence of individualized threat, and weak, if any, evidence that she would be singled out for severe disproportionate punishment for refusing to serve in the Eritrean military.[8] By contrast, in *Ghebremedhin*, the petitioner testified that his brother and a university colleague had been incarcerated and beaten to death for refusing to serve in the military. 385 F.3d at 1120. On this record, there is no such evidence to compel a finding of a well-founded fear of persecution. Accordingly, we must uphold the IJ's findings. 8 U.S.C. § 1252(b)(4)(B).

**[9]** Finally, Zehatye contends that she could be tortured if forced to return to Eritrea, citing a 2003 State Department report that describes the use of physical torture such as bondage, heat exposure, and beatings to punish those detained for their religious beliefs. The report references "several reports" of torture, but does not elaborate. It specifically notes sporadic detention of members of the Philadelphia Church of Asmara, the Association of Evangelical Churches, the Bethel

---

[8]The dissent cites the 2002 Religious Freedom Report, which references four Jehovah's Witnesses who "have been detained for varying periods of time, some more than five years" "without charge and without being tried for failing to participate in national service." The Report also notes that the army "resorted to various forms of extreme physical punishment to force objectors, including some members of Jehovah's Witnesses, to perform military service." We are not persuaded that "any reasonable adjudicator would be *compelled* to conclude," based on this evidence, that Jehovah's Witnesses are singled out for "severe disproportionate punishment" because of their religious beliefs. Therefore, we must affirm the IJ's findings under the substantial evidence standard. 8 U.S.C. § 1252(b)(4)(B).

Church, the Rehma Church, Pentecostal, Full Gospel and other small churches, but does not mention the Jehovah's Witnesses. To the contrary, the report states that conditions for Jehovah's Witnesses are improving:

> Jehovah's Witnesses . . . faced some social discrimination because of their refusal to participate in the 1993 independence referendum and to perform national service; however, the level of societal discrimination against Jehovah's Witnesses continued to decline during the year.

U.S. Dep't. of State, ERITREA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003 (Feb. 25, 2004) ("2003 Country Report").

[10] This evidence does not compel a finding that Zehatye has an objective well-founded fear of being tortured if returned to Eritrea.[9] *Ladha*, 215 F.3d at 897;[10] *see also Marcos v. Gonzales*, 410 F.3d 1112, 1120-21 (9th Cir. 2005) (requiring an individualized determination that changed conditions reported in Country Report will affect asylum applicant's specific situation). Accordingly, we are obligated to uphold the IJ's findings under the substantial evidence standard. *Elias-Zacarias*, 502 U.S. at 481.

---

[9]Nor does the dissent's citation to statements in the 2003 Country Report regarding harassment, discrimination and detention of Jehovah's Witnesses. *See, e.g., Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001) ("Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture.") (quoting 8 C.F.R. § 208.18(a)(2)), *amended by* 355 F.3d 1140 (9th Cir. 2004).

[10]In *Ladha*, we held that where an alien cannot establish past persecution, she can satisfy the objective prong of the well-founded fear analysis either by producing specific documentary evidence or by offering credible and persuasive testimony. 215 F.3d at 897. Zehatye fails to meet this burden because the 2003 Country Report's reference to torture is not specific to Jehovah's Witnesses and Zehatye offered no testimony regarding her alleged fear of torture.

The dissent suggests, notwithstanding, that we should grant review because the IJ failed to address factors pertinent to Zahatye's claims, citing *Tukhowinich v. INS*, 64 F.3d 460, 463-64 (9th Cir. 1995). *Tukhowinich* is inapposite. There, the IJ denied the petitioner's application for suspension of deportation based upon a finding of no extreme hardship. *Id*. at 462. The BIA affirmed the finding in a short opinion that relied solely upon the IJ's disposition. *Id*.

The BIA stated that the IJ considered Ms. Tukhowinich's "age, marital status, good health, family ties in the United States and in Thailand, in addition to the economic and *political conditions* in the respondent's native country." *Id*. at 463 (emphasis in original). In fact, however, the IJ's opinion did not mention *any aspect* of the political unrest in Thailand. Evidence introduced at the hearing before the IJ in the form of various newspaper clippings established that Thailand's democratic government had suffered a military coup on February 23, 1991, yet the IJ made *no mention* of these events. *Id*. We reversed and remanded "[b]ecause the BIA mistakenly referred to material not actually considered by the IJ" and because it "relied on an IJ's opinion lacking in consideration of all the relevant factors . . . ." *Id*. at 465.

By contrast, the IJ in the present case specifically considered the State Department reports that Zehatye cited in support of her asylum claim. Indeed, we respectfully disagree with the dissent's suggestion that the IJ "cherry-picked" only those facts that would cast doubt on Zehatye's asylum claim, while misstating or failing to acknowledge facts that would support her claim. For example, the IJ noted:

> State Department reports, both for Eritrea and Ethiopia, indicate that under some circumstances, members of Jehovah's Witnesses are clearly discriminated against, in some cases harassed because of their missionary work, and in some cases clearly have trouble with secular government with regard to

their position vis-a-vis military service or as in the case of Eritrea national service . . . . The State Department indicates there is no indication that any persons are detained or imprisoned solely because of their religious beliefs or practices; however, the government has singled out members of Jehovah's Witnesses for harsher treatment than that received by members of other faiths for similar actions. There are members of Jehovah's Witnesses detained without charge. The maximum penalty for refusing to do national service is three years. The ministry of justice of Eritrea has denied that any members of Jehovah's Witnesses were in detention without charges, although they acknowledge that some members of Jehovah's Witnesses and a number of Muslims were in jail serving sentences for convictions on charges of evading national service.

IJ's Oral Decision at 14.

Although the evidence may be susceptible to more than one rational interpretation, a reasonable fact finder could conclude on this record that Zehatye failed to establish past persecution or a well-founded fear of future persecution. Accordingly, we may not substitute our judgment for that of the IJ, as the dissent suggests. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001); *see also Aruta v. INS*, 80 F.3d 1389, 1393 (9th Cir. 1996) ("[W]e do not reverse the BIA simply because we disagree with its evaluation of the facts, but only if we conclude that the BIA's evaluation is not supported by substantial evidence." (internal quotation marks omitted)).

## B. Withholding of Removal

[11] An application for asylum under 8 U.S.C. § 1158 is generally considered an application for withholding of removal under 8 U.S.C. § 1231(b)(3). 8 C.F.R. § 1208.3(b); *Ghadessi v. INS*, 797 F.2d 804, 804 n.1 (9th Cir. 1986). "To

qualify for withholding of removal, an alien must demonstrate that it is more likely than not that he would be subject to persecution on one of the specified grounds." *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001) (internal quotation marks omitted). "This clear probability standard for withholding of removal is more stringent than the well-founded fear standard governing asylum." *Id.* at 888-89. The "standard has no subjective component, but, in fact, requires objective evidence that it is more likely than not that the alien will be subject to persecution upon deportation." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987).

**[12]** Since Zehatye could not establish her eligibility for asylum, the IJ properly concluded that she was not eligible for withholding of removal, which imposes a heavier burden of proof.

## IV.

The IJ's decision to deny asylum and withholding of removal was supported by reasonable, substantial, and probative evidence in the record. The evidence that Zehatye suffered some degree of social ostracism and economic hardship due to her religion did not rise to the level of persecution. *Gormley*, 364 F.3d at 1178; *Kazlauskas*, 46 F.3d at 907. Additionally, the government's mandatory conscription policy did not establish that Zehatye had suffered past persecution or that she had a well-founded fear of future persecution based on her religion. *Movsisian*, 395 F.3d at 1097. The petition for review is **DENIED**.

---

BERZON, Circuit Judge, dissenting:

I would grant the petition and remand for further consideration.

The Immigration Judge's (IJ) decision, summarily affirmed by the Board of Immigration Appeals (BIA), held that Zehatye did not establish a well-founded fear of future persecution sufficient for asylum eligibility. That conclusion was based on clear errors regarding some facts in the record and complete disregard of others. For these reasons, it should not stand.

In *Tukhowinich v. INS*, 64 F.3d 460, 463-64 (9th Cir. 1995), we granted the petition for review where the IJ failed to address a number of factors, pertinent to the merits of a suspension of deportation determination, including evidence introduced by the petitioner as to the political conditions in her native country. In that case, we stated that "[w]hen important aspects of the individual claim are distorted or disregarded, denial of relief is arbitrary. Without prescribing any final result, we must remand such cases for proper consideration." *Id*. at 464 (internal quotation marks omitted).

Other circuits have taken the same approach. *See Tan v. U.S. Attorney Gen.*, 446 F.3d 1369, 1375 (11th Cir. 2006) (granting a petition for review where the IJ failed to acknowledge the Country Reports and newspaper articles submitted by the petitioner and "misstated the contents of the record"); *Chen v. Gonzales*, 417 F.3d 268, 272-75 (2d Cir. 2005) (granting a petition for review where the BIA failed to consider evidence in the country conditions report that corroborated petitioner's account of persecution, stating "[w]here the immigration court fails to consider important evidence supporting a petitioner's claim, we are deprived of the ability adequately to review the claim and must vacate the decision and remand for further proceedings" (internal quotation marks omitted)); *Mukamusoni v. Ashcroft*, 390 F.3d 110, 123-24 (1st Cir. 2004) (vacating a decision of the BIA and remanding for reconsideration where the BIA failed to mention the background and country conditions evidence offered by the petitioner which, even on "a quick look," would support the petitioner's claim of persecution); *Chen v. U.S. INS*, 359 F.3d 121, 127 (2d Cir. 2004) ("[W]here the agency's determination

is based on an inaccurate perception of the record, omitting potentially significant facts, we may remand for reconsideration or rehearing . . . ."); *Zubeda v. Ashcroft*, 333 F.3d 463, 477-78 (3d Cir. 2003) (remanding for reconsideration where the BIA mischaracterized the country reports and "cavalierly dismissed the substantial documentation" contained therein); *Palavra v. INS*, 287 F.3d 690, 693-94 (8th Cir. 2002) (holding that the BIA "failed to perform its fact-finding function" when it failed to discuss supporting evidence in the record, and remanding for reconsideration, stating "[w]hen an agency finds a fact without mentioning or analyzing significant evidence, the agency needs to reconsider its decision").

As these cases make clear, the substantial evidence standard does not insulate from review an IJ's decision that cherry-picks from the administrative record only those facts that would cast doubt on a petitioner's claim, while misstating or failing to acknowledge the existence of those facts that would lend support to an account of persecution. *See Shah v. Attorney Gen. of the U.S.*, 446 F.3d 429, 437 (3d Cir. 2006) ("[W]e [do not] expect [an immigration] judge to selectively consider evidence, ignoring that evidence that corroborates an alien's claims and calls into question the conclusion the judge is attempting to reach."). Here there were several material misstatements or omissions that, in my view, necessitate a remand.

First, the IJ emphasized that the only indication that Zehatye was slated for conscription was that her name appeared on a list issued by the Kebele, a local government organization. In his oral decision, the IJ stated: "The names of individuals residing in the Kebele are normally maintained by the Kebele but not necessarily for military purposes or for recruitment purposes. The respondent maintains that her name was on this list in 1998 and that meant that she was subject to recruitment for national service in Eritrea as a result of the hostilities." The IJ further remarked: "The closest this respondent ever got

to a national service was, according to her testimony, her name on a list in a kebele in Asmara."

That is simply not so. Zehatye testified — in testimony that, as the majority agrees, must be deemed credible — that the police came to her home and ordered her to prepare to report for military duty, and that neighbors informed her that the police were planning to take her into custody the very night she fled Eritrea. So the premise for the IJ's conclusion that she was unlikely to be faced with the need to refuse conscription because of her religious beliefs were she to return to Eritrea is just wrong.

Further, although the majority correctly states that forced conscription, even in the face of religious objections to service, is not necessarily persecution on a proscribed ground, the case law in both our circuit and our sister circuits confirms that *discriminatory* treatment based on the religion of those who refuse conscription *is* persecution on a proscribed ground. *See Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir. 2004) ("When a country subjects a draft evader to more serious punishment than others who have also evaded service because of his race, religion, nationality, social group, or political opinion, this amounts to persecution rather than simple nationalism."); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir. 2004) (stating that disproportionately severe punishment on account of protected ground for failure to submit can support claim of asylum); *Canas-Segovia v. INS*, 970 F.2d 599, 601 (9th Cir. 1992) (holding that religious conscientious objectors could establish persecution claim provided that they could demonstrate that they were selected for mistreatment for their religious beliefs); *Barraza Rivera v. INS*, 913 F.2d 1443, 1450-51 (9th Cir. 1990) (relying on United Nations publication for proposition that "punishment for desertion or draft evasion, in itself, does not constitute persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . [b]ut disproportionately severe punishment on account of any of these

factors does constitute persecution"); *see also In re A-G-*, 19
I. & N. Dec. 502, 506 (BIA 1987) ("We hold to the long-
accepted position that it is not persecution for a country to
require military service of its citizens. Exceptions to this rule
may be recognized in those rare cases where a disproportion-
ately severe punishment would result on account of one of the
five grounds enumerated in section 101(a)(42)(A) of the Act
. . . ." (citations omitted)), *aff'd sub nom. M.A. v. U.S. INS*,
899 F.2d 304 (4th Cir. 1990) (en banc).

Indeed, the case the majority relies upon for the proposition
that a country's decision to require military service does not
amount to persecution states that "forced conscription or pun-
ishment for evasion of military duty *generally* does not con-
stitute persecution on account of a protected ground."
*Movsisian v. Ashcroft*, 395 F.3d 1095, 1097 (9th Cir. 2005)
(emphasis added). Two sentences after that statement, how-
ever, *Movsisian* recognizes the exception to the general rule,
noting that, in that case, the petitioner presented "no evidence
that the Armenian government would target him for conscrip-
tion or punishment on account of his religion or other pro-
tected ground." *Id.* (citing *Canas-Segovia*, 970 F.2d at 601).
Accordingly, *Movsisian* militates in favor of a finding of per-
secution where, as here, the petitioner's testimony, coupled
with ample supporting evidence in the administrative record,
confirms that her refusal to submit to military service could
be met with disproportionate punishment because her objec-
tion was premised on her beliefs as a Jehovah's Witness.

The IJ cites a denial by the Eritrean government that such
discrimination occurs, but disregards specific confirmation in
the same United States governmental publication containing
that denial, the 2002 International Religious Freedom Report
for Eritrea, that differential treatment with regard to refusal to
participate in national service does occur. That publication
states:

> Most members of Jehovah's Witnesses have refused
> on religious grounds to participate in national service

or to vote, which has led to widespread criticism that members of Jehovah's Witnesses collectively were shirking their civic duty. Some Muslims also have objected to universal national service because of the requirement that women perform military duty. The Government does not excuse individuals who object to national service for religious reasons or reasons of conscience, nor does the Government allow alternative service. Although persons from other religious groups, including Muslims, reportedly have been punished in past years for failure to participate in national service, only members of Jehovah's Witnesses have been subject to dismissal from the civil service, revocation their trading licenses, eviction from government-owned housing, and denial of passports, identity cards, and exit visas. However, there were no reports that Jehovah's Witnesses who performed national service and participated in the national independence referendum were subject to discrimination.

There is no indication that any persons are detained or imprisoned solely because of their religious beliefs or practices; however, the Government has singled out members of Jehovah's Witnesses for harsher treatment than that received by members of other faiths for similar actions. At the end of the period covered by this report, four members of Jehovah's Witnesses remained in detention without charge and without being tried *for failing to participate in national service. The individuals have been detained for varying periods of time, some for more than 5 years.* The maximum penalty for refusing to do national service is 3 years. Ministry of Justice officials have denied that any members of Jehovah's Witnesses were in detention without charges, although they acknowledge that some members of Jehovah's Witnesses and a number of Muslims were

> in jail serving sentences for convictions on charges of evading national service.

> The army resorted to various forms of extreme physical punishment to force objectors, including some members of Jehovah's Witnesses, to perform military service.

U.S. DEP'T OF STATE, ERITREA: INTERNATIONAL RELIGIOUS FREEDOM REPORT 2002 (Oct. 7, 2002) (hereinafter "Religious Freedom Report") (emphasis added). The State Department's 2002 Country Report on Human Rights Practices for Eritrea, also a part of the administrative record in this case, contains substantially similar evidence of the treatment suffered by Jehovah's Witnesses at the hands of the Eritrean government for failing to submit to military service, including indefinite detention and "extreme physical punishment." *See* U.S. DEP'T OF STATE, ERITREA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2002 (Mar. 31, 2003) (hereinafter "Country Report"). The IJ did not mention this very specific information in United States government documents, reciting instead the claim by the Eritrean Ministry of Justice to the contrary — that no Jehovah's Witnesses were in detention without charge for evading national service.[1]

At a minimum, we cannot evaluate the sufficiency of the evidence regarding whether Zehatye's fear of future persecution was well-founded unless we know *why* the IJ chose to disregard detailed, on-point statements in U.S. Government-authored reports in favor of a self-interested denial by the Eri-

---

[1]Notwithstanding the majority's claim that the State Department's 2003 Country Report "does not mention" detention of Jehovah's Witnesses, that report specifically states that the Eritrean government "continued to harass, detain, and discriminate against the small community of members of Jehovah's Witnesses because of their refusal, on religious grounds, to vote in the independence referendum or the refusal of some to perform national service." U.S. DEP'T OF STATE, ERITREA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003 (Feb. 25, 2004).

trean government. I would therefore hold that the IJ's decision is not supported by substantial evidence. *See Ibarra-Flores v. Gonzales*, 439 F.3d 614, 618 (9th Cir. 2006) ("Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (internal quotation marks omitted)).

The Country Report also dispels any notion that the standard "punishment" for draft evasion could be considered to be simple law enforcement. "During the year, the police severely mistreated and beat army deserters and draft evaders. The police subjected deserters and draft evaders to various military disciplinary actions that included prolonged sun exposure in temperatures of up to 113 degrees Fahrenheit or the tying of the hands and feet for extended periods of time." Moreover, although the economic deprivation Zehatye complains of likely does not rise to the level of persecution by itself, *see Gormley v. Ashcroft*, 364 F.3d 1172, 1177-80 (9th Cir. 2004), both the Country Report and Religious Freedom Report lend substantial credibility to her story that her family suffered economic discrimination at the hands of the Eritrean government on account of their religious beliefs. When this propensity to disadvantage Jehovah's Witnesses is coupled with the punishment generally imposed for failing to take up arms, I believe she has demonstrated a well-founded fear of future persecution on a proscribed ground.

The Seventh Circuit has recently held in a strikingly similar case that the evidence contained in the 2003 Country Report and Religious Freedom Report for Eritrea as to the persecution suffered by Jehovah's Witnesses in Eritrea, particularly with regard to punishment for refusing conscription, was so compelling that no reasonable factfinder could determine that the petitioner lacked a well-founded fear of persecution. *See Ghebremedhin*, 385 F.3d at 1119-20. Citing the *same* language contained in the 2002 Country Report and Religious Freedom Report submitted in Zehatye's case, the Seventh Circuit held that the IJ's denial of asylum was not supported by

substantial evidence because of Eritrea's predilection to incarcerate, occasionally indefinitely, Jehovah's Witnesses who refuse to serve in the military for religious reasons, and the observation that Jehovah's Witnesses are singled out "for harsher treatment." *Id*. at 1120. I agree with the Seventh Circuit. Seeing no practical difference between Ms. Zehatye's claim and that of the petitioner in *Ghebremedhin*,[2] I would grant the petition for review.

I add one further note: The attitude of some IJs to the asylum seekers and others who appear before them has become the subject of national attention recently. *See* Memorandum from Attorney General Alberto Gonzales to Members of the Board of Immigration Appeals (Jan. 9, 2006) (noting with concern that recent reports have indicated that some immigration judges "fail to treat aliens appearing before them with appropriate respect and considerations" and acknowledging that the conduct of some immigration judges "can aptly be described as intemperate or even abusive"); *see also Cham v. Attorney Gen. of the U.S.*, 445 F.3d 683, 686 (3d Cir. 2006) ("The case now before us exemplifies the severe wound . . . inflicted when not a modicum of courtesy, of respect, or of any pretense of fairness is extended to a petitioner and the case he so valiantly attempted to present." (omission in original) (internal quotation marks omitted)); *Benslimane v. Gonzales*, 430 F.3d 828, 830 (7th Cir. 2005) ("[T]he adjudication of [immigration] cases at the administrative level has fallen below the minimum standards of legal justice."), *Wang v. Attorney Gen. of the U.S.*, 423 F.3d 260, 269 (3d Cir. 2005) ("The tone, the tenor, the disparagement, and the sarcasm of the IJ seem more appropriate to a court television show than a federal court proceeding."), *Rivera v. Ashcroft*, 394 F.3d 1129, 1135 (9th Cir. 2005) ("Both the decision issued by the

---

[2]The majority suggests that *Ghebremedhin* is not apposite because in that case, the petitioner had a personal association with individuals who had been persecuted. Ms. Zehatye did as well: She testified that her brother was imprisoned because of his religious beliefs.

IJ and her conduct of the hearing demonstrate that the IJ did not conduct herself as an impartial judge but rather as a prosecutor anxious to pick holes in the petitioner's story." (internal quotation marks omitted)). The overall tone of Immigration Judge Brian Simpson's opinion in this case is such that I can have no confidence in his factual findings. His opinion is belittling and patronizing as well as inaccurate, even as to less material details.

For example, Judge Simpson suggested — but did not hold — that Zehatye's entire story is suspect because women may not be conscripted in Eritrea: "The respondent claims that she was threatened with national service and the Court cannot find that that is inherently unworthy of belief, although it has very little information with regard to the extent to which females are required to perform national service and what happened to them if they refused." Yet, the Country Report contained in the administrative record makes quite clear that women in Eritrea are in fact conscripted, and subject to detention for failure to report: "The law requires women between the ages of 18 and 40 to participate in national service. During the year there were increased efforts to detain women draft evaders and deserters." (internal cross-references omitted). The Country Report goes on to note:

> During the year, the Government deployed military police throughout the country using roadblocks, street sweeps, and house-to-house searches to find deserters and draft evaders. The military police detained persons who had not completed their national service requirement, and those who had evaded previous drafts. There was a general public perception that these round-ups were directed particularly at female draftees.

(internal cross-references omitted).

In addition, Judge Simpson's discussion of Zehatye's residence in Ethiopia, where she lived after fleeing Eritrea borders, to say the least, on the illogical, as well as on the intemperate. He first expressed doubts about why Zehatye would seek refuge in neighboring Ethiopia: "Why, therefore, this respondent should have chosen to leave Eritrea for Ethiopia in 1999 is simply something this Court cannot understand and this respondent, in the Court's opinion, did not satisfactorily answer the question." Judge Simpson then answered his own question, quite satisfactorily in my opinion, by detailing Zehatye's rationale for her flight to Ethiopia, which Judge Simpson noted, is supported by the record: "Her answer was because Jehovah's Witnesses fared better in terms of their situation vis-a-vis the government of Ethiopia than the Jehovah's Witnesses in Eritrea. There is some support for that position in terms of the position of the Ethiopian government as indicated in the *Country Reports* on Ethiopia for 2001."[3] Later on in his oral decision Judge Simpson commented: "The question that begs the answer is what was she doing in Ethiopia at all in 1999, much less why she remained there for two years before going to Kenya? We may never get the answer to these questions."

The entire discussion on this point is quite simply baffling. We *do* have the answer to why Zehatye fled to Ethiopia, as

---

[3]In her testimony before the IJ, Zehatye stated that she left Eritrea for Ethiopia because Jehovah's Witnesses were treated better in Ethiopia where there was "freedom of religion." Zehatye also testified that although the Ethiopian government was hostile to native Eritreans, it "wouldn't deport" Jehovah's Witnesses back to Eritrea. This testimony is largely consistent with the State Department Country Report for Ethiopia which states: "There are more than 6,000 members of Jehovah's Witnesses in the country. The Government continued its policy of not deporting members of Jehovah's Witnesses of Eritrean origin, who might face religious repression in Eritrea." U.S. DEP'T OF STATE, ETHIOPIA: COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001 (Mar. 4, 2002). The Country Report for Ethiopia also states that the Ethiopian government provided land for Jehovah's Witnesses outside Addis Ababa. *See id.*

Judge Simpson himself noted in his decision a mere eight pages earlier: Jehovah's Witnesses fared much better in Ethiopia than in neighboring Eritrea. Not only do we have to accept Zehatye's testimony on this point as credible, we have evidence in the Country Report for Ethiopia to support her account. Judge Simpson's puzzlement as to Zehatye's residence in Ethiopia is therefore inexplicable.

As a final example, Judge Simpson was repeatedly critical of Zehatye's lack of identification documents, which she testified was due to the Eritrean government's refusal to provide such documentation to members of the Jehovah's Witness faith. Again, to anyone who read the Country Report, this would come as no surprise, as that publication specifically states: "Jehovah's Witnesses often were denied identification cards, passports, exit visas, trading licenses, government housing, and government employment unless they hid their religion."

Judge Simpson's degree of suspicion of the petitioner with regard to easily confirmable facts, as well as the intemperate manner in which he expressed that suspicion, indicates to me intolerance for the applicant for asylum inconsistent with fair decisionmaking.

I would therefore grant the petition and remand for a new, accurate determination regarding eligibility for asylum, before a different IJ.