HALL, Circuit Judge,
dissenting:
I believe a fair reading of the evidence before the Immigration Judge (“IJ”) supports her findings that country conditions in Armenia had “fundamentally changed” between 2002 and 2004 for Jehovah’s Witnesses who, like petitioner Garegin Kamalyan, were persecuted in the past for proselytizing, and that petitioner no longer has a “well-founded fear of future persecution.” I disagree with the majority that any reasonable adjudicator would be compelled to reach a contrary conclusion. Accordingly, I respectfully dissent.
I.
In ruling on the petition in this case, the IJ found that Kamalyan, a Jehovah’s Witness and citizen of Armenia, had suffered “past persecution” on account of his religion, based on two incidents of beatings by Armenian police in 2001 and 2002 while in detention after being arrested for “proselytizing” in violation of Armenian law. The IJ specifically found Kamalyan to be credible, and found his showing of past persecution sufficient to gave rise to a presumption of a “well-founded fear of future persecution.” See Zehatye v. Gonzales, 453 F.3d 1182, 1185 (9th Cir.2006). The IJ found the presumption of future persecution rebutted, however, by Kamalyan’s own testimony and two U.S. State Department reports — Armenia: International Religious Freedom Report 200k (Sept. 15, 2004) (“2004 Religious Freedom Report”), and Armenia: Country Reports on Human Rights Practices — 2003 (Feb. *1059 25, 2004) (“2003 Human Rights Report”)— which indicated that the status and official treatment of Jehovah’s Witnesses and other minority religions in Armenia had fundamentally changed by the time of the hearing on the petition on November 24, 2004. The BIA adopted and affirmed the decision of the IJ because “the country information in the record ... confirms improved conditions for Jehovah’s Witnesses!,] • • • the evidence of improved country conditions went unrebutted, and ... [Kamalyan] consequently has failed to meet his burden of proof for eligibility for asylum, withholding of removal, and relief pursuant to the Convention Against Torture.”
II.
We review a denial of asylum eligibility for substantial evidence and must uphold the denial if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. Li v. Holder, 559 F.3d 1096, 1102 (9th Cir. 2009); Zehatye, 453 F.3d at 1185. “[Administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.” 8 U.S.C. § 1252(b)(4)(B); see also INS v. Elias-Zacayias, 502 U.S. 478, 483-84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). “This ‘strict standard’ precludes us from ‘independently weighing the evidence and holding that the petitioner is eligible for asylum, except in cases where compelling evidence is shown.’ ” Gu v. Gonzales, 454 F.3d 1014, 1018-19 (9th Cir.2006) (quoting Kotasz v. INS, 31 F.3d 847, 851 (9th Cir. 1994)).
In order to meet its burden of proving a fundamental change of circumstances, the government is “obligated to introduce evidence that, on an individualized basis, rebuts a particular applicant’s specific grounds for his well-founded fear of future persecution.” Popova v. INS, 273 F.3d 1251, 1259 (9th Cir.2001). Where past persecution has been established, generalized information from a State Department report on country conditions is not sufficient to rebut the presumption of future persecution. Molina-Estrada v. INS, 293 F.3d 1089, 1096 (9th Cir.2002) (emphasis added). However, an analysis of changed country conditions tailored to the petitioner’s individual claims of persecution is sufficient to rebut the presumption. Gonzalez-Hernandez v. Ashcroft, 336 F.3d 995, 997-1000 (9th Cir.2003); see also Sowe v. Mukasey, 538 F.3d 1281, 1285 (9th Cir. 2008) (rejecting petitioner’s argument that State Department country reports are “generalized materials” that are insufficient to rebut a presumed well-founded fear of future persecution).
III.
In concluding that the evidence before the IJ did not establish a fundamental change in conditions for Jehovah’s Witnesses in Armenia, the majority brushes aside Kamalyan’s testimony, and considers only the two country reports issued by the State Department in 2004. The majority then proceeds to discount the information from the 2003 Human Rights Report and the 2004 Religious Freedom Report on which the IJ relied, describing them as “inconclusive.” Maj. Op. at 1058. I believe the majority misapprehends the IJ’s decision and misapplies relevant Ninth Circuit law.
First, the majority suggests that Kamalyan’s testimony at the November 2004 hearing provides no support for the IJ’s decision. Although the IJ commented that Kamalyan’s testimony was “somewhat vague,” and that he did not have any “specific information” about the “very recent current conditions” in Armenia,[1] she did credit testimony in which he “admitted *1060 that he [was] aware that it became ‘legal’ to be a Jehovah’s Witness in Armenia within approximately the past month.” Kamalyan’s testimony on this point was that the Jehovah’s Witness religion had become “legal” about a month before the hearing, and he said he knew this because “it was announced on TV that [his] religion had been officially allowed in the country,” and that he had read on the Internet that “Jehovah’s Witness is now a recognized religion” in Armenia. Kamalyan added that he believed it was thereafter legal for Jehovah’s Witnesses to proselytize in Armenia. Relying on the 2004 Religious Freedom Report, the IJ took notice of “the change in the ability of Jehovah’s Witnesses to register as a recognized religion in Armenia,” and the fact that Armenian Jehovah’s Witnesses had “expressed satisfaction that they were making progress towards registration.”
To be sure, the IJ did not give great weight to Kamalyan’s testimony for the reasons stated, but also because he, a non-lawyer, did not seem to have a clear understanding of what it meant that the Jehovah’s Witness religion was now “legal.”[2] In fact, however, Kamalyan was correct that the Armenian government had already granted the Jehovah’s Witnesses formal registration as a religion in October 2004. See U.S. Dept. of State, Armenia: International Religious Freedom Report 2005 (Nov. 8, 2005) (“2005 Religious Freedom Report”) at 3.[3] As a result, Armenian Jehovah’s Witnesses were thereafter free to publish newspapers or magazines, rent meeting places,[4] broadcast programs on television or radio, and officially sponsor visas for visitors. Id.-, see also 2004 Religious Freedom Report at 3. Whereas Armenian Jehovah’s Witnesses had previously been able to import only “small quantities of printed materials for their own use,” they were also, as of and after October 2004, allowed to import large quantities of religious materials. Id.[5]
*1061 On the other hand, Kamalyan was not correct in believing that the 1991 ban on proselytizing was lifted as to Jehovah’s Witnesses after they obtained official recognition from the Armenian government, as the ban technically applied and continues to apply to all religious groups in Armenia — albeit with phrasing that appears to exempt the national religion, that of the Armenian Apostolic Church. See 2004 Religious Freedom Report at 3. As stated in the 2003 Human Rights Report, however, the proselytizing ban was not being enforced at the time of the hearing, and “all denominations, including Jehovah’s Witnesses, could advocate their point of view.”[6] Id. at 8. Moreover, except for a report of a few “official warnings” to individual Jehovah’s Witnesses regarding their “illegal” proselytizing activities, there was no evidence of any detentions or active prosecutions of Jehovah’s Witnesses for violating that law. 2004 Religious Freedom Report at 5. That religious freedoms for Armenian Jehovah’s Witnesses (including, arguably, their freedom to proselytize) had already improved by the time of Kamalyan’s hearing is reinforced by the fact that they were the only religious minority to claim an increase in the number of adherents — from approximately 7,500 to 8,500 between September 2004 and November 2005 — as a result of their “missionary program.” Compare 2004 Religious Freedom Report at 2, with 2005 Religious Freedom Report at 2.
As the majority notes, the 2003 and 2004 country reports admitted into evidence during the hearing do contain some bits of information that cut against the IJ’s finding of changed country conditions — as the majority highlights by selectively quoting from very general, introductory passages in the two reports.[7] Maj. Op. at 1057-58. But a sizeable body of Ninth Circuit case law suggests not only that State Department country reports are “the most important and perhaps the best source of information” on conditions in foreign nations, Sowe, 538 F.3d at 1285, but also that this court must defer to individualized findings by the IJ regarding “changed conditions” that are supported by the country reports, even where the relevant country reports contain contradictory information. Id. at 1286 (this court is not in a position to second-guess the IJ’s construction of a “somewhat contradictory” country report). Indeed, “where the [IJ] rationally construes an ambiguous or somewhat contradictory country report and provides an individualized analysis of how changed conditions will affect the specific petitioner’s situation, substantial evidence will support the agency determination.” Id. (quoting Gonzalez-Hemandez, 336 F.3d at 1000). Thus, even if the contradictory portions of the country reports were weighty — which *1062 they are not — we would not be free to second-guess the IJ’s findings to the extent they are based on those reports.
IV.
In sum, when the portions of the two country reports dealing with the religious freedoms of Jehovah’s Witnesses are read carefully and objectively, and viewed together with Kamalyan’s testimony, it is clear that substantial evidence supports the IJ’s finding of significant improvements in the conditions germane to Kamalyan’s claim of a well-founded fear of future persecution. In addition, Kamalyan’s testimony about recent events that made it “legal” to be a Jehovah’s Witness, and the IJ’s finding of a positive change in the ability of Armenian Jehovah’s Witnesses to register as a religion, were confirmed in the 2005 Religious Freedom Report, where it was noted that, approximately one month before Kamalyan’s asylum hearing, they had-secured substantial religious freedoms by successfully completing the registration process. Id. at 1.
On this record, the majority’s conclusion that the government did not carry its burden of proving a “fundamental change” in conditions for Jehovah’s Witnesses in Armenia, and in particular for those who, like Kamalyan, were persecuted in the past for proselytizing, is simply not “compelled” by the evidence. I would deny the petition.

. For example, when the IJ inquired about the factual basis for his belief that “law en *1060 forcement [was] still arresting] Jehovah’s Witnesses for proselytizing,” Kamalyan candidly admitted he had no personal knowledge of any facts to support that claim, saying: “I don't know anybody who has been arrested during the last [month], personally; but I’m very sure, I’m positive that such things are still going on in Armenia.”

. For example, the IJ noted Kamalyan's opinion that "the recent change [did] not make any difference to his situation,” because "it was always on paper legal to be a Jehovah’s Witness but that still they were persecuted in Armenia.”

. We have previously taken judicial notice of creditable, well-publicized accounts of changes in country conditions occurring after the BIA decision — albeit in a case where conditions had significantly worsened while the appeal was pending. Gafoorv. INS, 231 F.3d 645, 654-56 (9th Cir.2000), superseded by statute on other grounds as stated in Parussimova v. Mukasey, 555 F.3d 734, 739-40 (9th Cir. 2009). Of course, we may not determine the issue of changed country conditions in the first instance, INS v. Ventura, 537 U.S. 12, 16, 123 S.Ct. 353, 154 L.Ed.2d 111 (2002), but there is no reason to ignore State Department country reports that merely confirm that the "changed conditions” found by the IJ continued to unfold as the IJ believed they would— i.e., in the direction of expanded religious freedoms for Armenian Jehovah's Witnesses in general, and for Kamalyan in particular.

. As the IJ found, this new freedom was especially relevant to Kamalyan’s case because he indicated that his group of Jehovah’s Witnesses had to meet in private homes because they were unable to rent a public meeting place. Indeed, his first arrest was precipitated when the police found small quantities of printed religious materials during a meeting in his home, which he said was for personal use even though he admitted he was also proselytizing at the time.

. In addition, the IJ found that the "official attitude” toward Jehovah's Witnesses had improved even before the registration process was completed. Specifically, during the year prior to the hearing, there were no reports of Jehovah’s Witnesses losing their jobs because *1061 of their religion, as they had in the past; and there was no officially sponsored violence or harassment of Jehovah’s Witnesses during the reporting period. See 2004 Religious Freedom Report at 4-5.

. Indeed, the proselytizing ban remains on the books to this day, but is still not being enforced. See Armenia: Country Reports on Human Rights Practices — 2009 (Mar. 11, 2010) at 27.

. The statement quoted by the majority about Jehovah's Witnesses being "detain[ed]” comes from the introduction to the 2003 Human Rights Report and refers to Jehovah's Witnesses imprisoned for draft evasion in violation of Armenia’s universal conscription laws prior to the enactment of a statute allowing for "alternative military service,” which took effect on June 1, 2004, but had not yet been implemented at the time of Kamalyan’s hearing. See id. at 1. There is no other reference in that report to unlawful detentions or any other type of abuse of Jehovah’s Witnesses by the government for any other reason. At no time has Kamalyan claimed he was persecuted for refusing conscription; thus, these detentions are not germane to Kamalyan’s asylum claim.