# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

─────────

No. 13-60362
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

June 19, 2014

Lyle W. Cayce
Clerk

─────────

YOHANNES GHIRMAY MILAT,

Petitioner

v.

ERIC H. HOLDER, JR., U.S. ATTORNEY GENERAL,

Respondent

─────────────────

Petition for Review of an Order of the
Board of Immigration Appeals

─────────────────

Before REAVLEY, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Eritrean national, Petitioner Yohannes Ghirmay Milat ("Milat") requests asylum, withholding of removal, and protection under the Convention Against Torture. Milat claims he fled Eritrea to escape an assignment within Eritrea's National Service program, which he asserts is a program of human trafficking and not a legitimate program of military conscription. The Immigration Judge ("IJ") denied Milat's application for asylum and withholding of removal, but granted his application for protection under the Convention Against Torture ("CAT"). The Board of Immigration Appeals ("BIA") affirmed. Milat petitions this Court for review, arguing that the BIA erred in denying his application for asylum and withholding of removal, and

No. 13-60362

that the BIA should have reopened and remanded his case for the IJ to consider new evidence.  For the reasons stated below, we deny Milat's petition.

## I.     BACKGROUND

Milat's argument for asylum centers on his conditions of employment in Eritrea, so we begin by reviewing that history, which we draw from the administrative record.  Milat studied  journalism and mass communication at Asmara University.  Just before graduation, he went to work for the Eritrean Ministry of Defense in what, Milat claims, was supposed to be a temporary postgraduate internship.  Milat wrote articles for the Defense Ministry's official magazine, and assisted with the videotaping of official meetings.  Milat avers, "It was expected that all work I produced should be supportive of government policies."

In March 2007, Milat learned that, because the government was closing Asmara University, he would officially graduate from Meinefe College.  Milat says, "When I heard that I would not be graduating from Asmara, I became very frustrated and angry at the government."  Milat believed that the "closing of Asmara was the government[']s shameful attempt to control the thinking of university students by breaking up the college into smaller components that it could more easily control."

With the assistance of one of his college friends, Milat created a political cartoon in protest.  "The design had a picture of Asmara University, a grave-cross, and a tomb.  Its message was that the government was killing the university," Milat explains.

After Milat showed the graphic to his colleagues, Milat's supervisor at the Defense Ministry, Lieutenant Colonel Asmerom, found out about it.  Fortunately for Milat, Milat's supervisor was also an Asmara University alumnus, and he was sympathetic to Milat's sentiments.  But he warned Milat "not to do that anymore," and he told Milat "that next time he would have to

No. 13-60362

report [Milat] to the higher authorities." There is no evidence Lieutenant Colonel Asmerom reported the political cartoon to the authorities, however.

Milat says he "found working for the Ministry of Defense morally and professionally reprehensible," because he "did not want to be used as a mouthpiece for the Ministry of Defense." On cross-examination before the IJ, however, Milat admitted that his job did not require him to kill or persecute other Eritreans. Milat looked forward to the end of his internship with the Defense Ministry, he said, because he would have "preferred . . . to work as a fair, objective and non-partial journalist instead of [as] a propaganda writer who advocate[s] policies of [the] Eritrean government." Milat believed that his internship with the Ministry of Defense would end when he graduated from college in September 2007. Milat did not get his wish.

The Ministry of Defense informed Milat that he would be made a permanent member of the Defense Ministry as part of his National Service, and he would not be reassigned.

Milat presented the following evidence to the IJ to explain the Eritrean National Service program. According to a report Milat submitted to the IJ, U.S. Department of State, *2008 Human Rights Report: Eritrea* (Feb. 25, 2009),[1] the Eritrean National Service is a compulsory conscription program for men between ages 18 and 50. It includes military and civilian jobs with open-ended terms. Some National Service members are assigned to civilian jobs while nominally kept in the military; these individuals continue to receive only their National Service salary, which is very low (Milat testified he received the equivalent of between five and ten U.S. dollars per month). Anything above that amount is forfeited to the government. These employees are unable to

---

[1] Reports from the U.S. Department of State are "the most appropriate and perhaps the best resource . . . to obtain information on political situations in foreign nations." *Rojas v. I.N.S.*, 937 F.2d 186, 190 n.1 (5th Cir. 1991).

No. 13-60362

leave their jobs or take new employment. "Security force personnel detained individuals for evading national service, generally for fewer than three days . . . ." Further, "[d]raft evaders often were used as laborers on government development projects."

Milat also submitted a 2009 report, Human Rights Watch, *Service for Life: State Repression and Indefinite Conscription in Eritrea* (2009). This report covers many of the same topics as the 2008 State Department report, but it paints a much darker picture of general conditions in Eritrea. According to this report, "[a] national network of jails and detention facilities holds those who try and avoid national service alongside political prisoners and those imprisoned solely for their religious beliefs. Torture, cruel[] and degrading treatment, and forced labor are routine." Moreover, "[t]hose who try and flee the country are imprisoned or risk being shot on sight at the border. Refugees who fled . . . and were forcibly repatriated have faced detention and torture upon return to Eritrea." National Service includes military service, but also deployment "in what constitutes illegal forced labor." "Those who try and evade national service are treated cruelly. Evaders are detained in terrible conditions, and heavy penalties are imposed on the families of those who evade service or flee the country." "The Eritrean government considers leaving the country without a valid exit visa a crime, and absconding from National Service is viewed as tantamount to treason." Thus, "punishments inflicted on asylum seekers who are forcibly returned are terrible, including torture and death."

Rather than accept permanent assignment to the Defense Ministry, Milat refused to sign his mobilization forms. Instead, he contacted the Ministry of Education in an effort to obtain a different assignment.

A few months later, Milat was on his way home from work when he observed military policemen outside his home questioning his family.

4

Believing the police were there to arrest him for evading conscription, Milat ran away to stay with a friend. Milat then decided to flee the country. Milat left Eritrea with his national identification card, but without a passport.

Milat fears return to Eritrea because he believes his former supervisor, Lieutenant Colonel Asmerom, "must have informed t[he] government" about his political cartoon critical of the government's decision to close Amsara University. Milat believes this because, he claims, "[i]t is normal operating procedure for the superior to give a full report to the government regarding the person who has fled." He believes that the government "now considers [him] a political opponent of the regime."

Milat's sister, Feven Ghirmay Milat, lived in Eritrea until recently. She testified before the IJ that, if her brother Milat returns to Eritrea, "[h]e would be imprisoned and would encounter other problems." When asked to elaborate on what she meant by "other problems," Milat's sister explained: "It's not only imprisonment that happens to people like that. Some of them are being killed and some of them have a lot of things that happen to a lot of people."

Milat's brother, mother, and uncles remain in Eritrea. Milat testified that he still communicates with them. The IJ asked Milat why he had not submitted a letter from his mother as part of his asylum application, to corroborate his story about the police visit at his home, for example. Milat explained that he thought government officials might inspect the letter.

After he fled Eritrea, the Eritrean government furnished Milat with two passports—notwithstanding his belief that the Eritrean government considered him a political opponent. Milat obtained an Eritrean passport from the Eritrean embassy in Sudan. To obtain the passport, Milat signed a statement acknowledging he was aware of the consequences of leaving Eritrea without permission. Milat claims the Eritrean government keeps this statement on file to "be used against" him if he returns; the statement, he says,

shows "that you were a traitor." Milat used this passport to travel to the United Arab Emirates, where he lost the passport. Again, the Eritrean embassy provided him a passport, his second, and with this passport he traveled to South America. Milat also testified that the Eritrean government provided him copies of his birth certificate, university degree, and temporary certificate of graduation. On cross-examination, Milat explained that Eritrean government issued him these documents because it did not want its citizens going to the Ethiopian government to obtain these same documents. *See generally Tesfamichael v. Gonzales*, 469 F.3d 109, 111–12 (5th Cir. 2006) (describing the history of tension between Eritrea and Ethiopia after the Ethiopian–Eritrean conflict).

Milat traveled from South America to Mexico, and then he entered the United States at or near Brownsville, Texas. The Department of Homeland Security issued a Notice to Appear in immigration court charging Milat as subject to removal as an alien present in the United States illegally in violation of 8 U.S.C. § 1182(a)(6)(A)(i) (commonly referred to as section 212(a)(6)(A)(i) of the Immigration and Nationality Act).

After listening to testimony and considering the record, the IJ issued an oral decision denying Milat's application for asylum and withholding of removal, and granting his application for protection under the CAT. The IJ found that Milat did not establish past persecution within the meaning of the Immigration and Nationality Act ("INA"). The IJ observed that the evidence did not establish that the police's reason for the visit to the Milat's family home was to arrest him. The IJ also concluded Milat failed to show well-founded fear of persecution because his flight from Eritrea amounted to desertion— failure to fulfill his National Service obligation. Further, the IJ reasoned that there is no evidence Milat's supervisor reported his political cartoon to authorities, so there was no reason to conclude the knowledge of his political

No. 13-60362

cartoon should be imputed to the government.  Finally, the IJ concluded Milat had not shown that his conscription in the National Service would force him to participate in inhumane conduct as a journalist for the Ministry of Defense. The IJ did, however, grant his application for CAT relief based on the Eritrean government's practices and its appalling human rights record.

On appeal, the BIA affirmed the IJ's findings and denied Milat's request for remand so the IJ could consider new evidence.  Milat timely petitioned for review to this Court.

## II.     JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review legal claims raised in a petition for review of a BIA decision.  8 U.S.C. § 1252(a)(2)(D); *Ramos–Bonilla v. Mukasey*, 543 F.3d 216, 219 (5th Cir. 2008).  "However, a petitioner must exhaust all administrative remedies before appealing to this court." *Id.* (citing § 1252(d)).[2] We review the BIA's legal conclusions de novo.  *Orellana–Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012).[3]  We review the factual findings for substantial evidence.  *Wang v. Holder*, 569 F.3d 531, 536 (5th Cir. 2009).  Our review of factual findings is narrow in scope.  We will not substitute our judgment for the factfinder's on credibility determinations.  *Orellana–Monson*, 685 F.3d at 518.  And we will reverse for lack of substantial evidence only if we decide "not only that the evidence supports a contrary conclusion, but also that the evidence *compels* it." *Chen v. Gonzales*, 470 F.3d 1131, 1334 (5th Cir. 2006) (internal quotation marks omitted); *see also Wang*, 569 F.3d at 538 ("[W]e must

---

[2] The government contends Milat did not present his argument based on the distinction between legitimate and illegitimate conscription in his appeal to the BIA, and therefore, this argument is unexhausted.  Our review of the record, however, shows Milat presented this argument to the BIA.  Thus, we find this issue is exhausted and reach the merits.

[3] A legal conclusion that represents the BIA's interpretation of an ambiguous statute it administers is not reviewed de novo, however—instead, the interpretation is entitled to *Chevron* deference.  *Orellana–Monson*, 685 F.3d at 517.

defer to the BIA's factual findings unless the evidence is so compelling that no reasonable fact finder could fail to find otherwise." (internal quotation marks omitted)).

## III. DISCUSSION

Milat petitions for review of the BIA's decision denying his asylum application and his application for withholding of removal, and he raises two issues. (A) Milat argues the BIA erred in concluding that Milat did not show persecution. Milat argues the BIA's error arises from its suppositions that the Eritrean government could lawfully prosecute him for evading conscription, and that Milat did not show persecution on account of his political opinions as expressed through a political cartoon. (B) Milat also argues the BIA should have remanded his case back to the IJ for reconsideration in light of newly discovered evidence concerning human rights violations in Eritrea. Because Milat does not challenge the IJ's ruling granting him relief under the CAT, we do not review this decision. The government opposes the petition arguing any punishment Milat would receive on return to Eritrea "would be the result of his failure to reenlist in the Eritrean National Service," and not on account of a protected ground under the INA such as for his political opinion. The government also argues the BIA "acted well within its considerable discretion in denying . . . Milat's motion to remand." These issues are addressed in turn below.

## A.     The BIA's Decision Denying Asylum and Upholding Removal

Milat challenges the BIA's decision denying his asylum application and denying his application for withholding of removal. Because "the failure to establish a well-founded fear for asylum eligibility also forecloses eligibility for withholding of removal," *Orellana–Monson*, 685 F.3d at 518, we address Milat's asylum-application argument first. *See id.* (explaining "the asylum standard is more lenient than the standard for withholding of removal").

8

"Section 208(a) of the Immigration and Nationality Act authorizes the Attorney General, in his discretion, to grant asylum to an alien who is a 'refugee' as defined in the Act . . . ." *I.N.S. v. Elias–Zacarias*, 502 U.S. 478, 481 (1992) (citation omitted).  The statute defines "refugee" as any person "who is unable or unwilling to return" to the country of the person's nationality "because of persecution or a well-founded fear of persecution on account of [1] race, [2] religion, [3] nationality, [4] membership in a particular social group, or [5] political opinion . . . ."  8 U.S.C. § 1101(a)(42)(A).  Thus, to obtain asylum, the applicant must demonstrate either past persecution or a reasonable, well-founded fear of future persecution on account of one of the five enumerated factors.  8 C.F.R. § 208.13(b); *Zamora–Morel v. I.N.S.*, 905 F.2d 833, 837 (5th Cir. 1990).

In this case, Milat argues he is unable or unwilling to return to Eritrea under only one of the protected factors—persecution on account of his political opinion.  To demonstrate persecution "on account of" political opinion, the burden is on the alien to prove his "political opinion was or will be at least one central reason for persecuting the applicant."  8 U.S.C. § 1158(b)(1)(B)(i).  "[A]lthough a statutorily protected ground need not be the only reason for harm, it cannot be 'incidental, tangential, superficial, or subordinate to another reason for harm.'" *Shaikh v. Holder*, 588 F.3d 861, 864 (5th Cir. 2009).

Milat argues he has suffered past persecution, and has a well-founded fear of future persecution, because he evaded his conscription into the Eritrean National Service and he will be punished if he returns.  Thus, Milat's appeal turns in part on whether the Eritrean National Service, of itself, constitutes persecution on account of political opinion under the INA.

The parties disagree about the legal significance of Eritrean National Service and the Eritrean government's practices enforcing its conscription laws.  Milat argues that courts distinguish between "circumstances whe[re]

conscription is illegitimate" and "normal circumstances [where] a country maintains the right to conscript citizens for military service and to punish them . . . for refusing to serve." For this proposition, Milat relies on persuasive authority from the BIA and other circuits. The government concedes that "punishment for avoiding military service may constitute persecution" in some cases. But the government argues these situations fall within limited exceptions that apply only if the result is a "disproportionately severe punishment on account of a protected ground," such as political opinion, or would effectively conscript the alien "to engage in inhumane conduct." Because Milat's case does not fall within these exceptions, the government argues we should deny his petition for review.

In accordance with the view of the other circuits that have considered the question, we hold that punishment for violation of conscription laws of general applicability does not in itself constitute "persecution" on account of political opinion under § 1101(a)(42)(A). *See Elias–Zacarias*, 502 U.S. at 481–82 (rejecting view that a political "organization's attempt to conscript a person into its military forces necessarily constitutes 'persecution on account of . . . political opinion'" (alteration in original)); *see also* Deborah Anker, *Law of Asylum in the United States* § 4.6 (2014) ("[P]rosecution for refusal to obey compulsory military service laws 'generally does not constitute persecution . . . .'" (quoting *Movsisian v. Ashcroft*, 395 F.3d 1095, 1097 (9th Cir. 2005)). Further, we conclude that prosecution for avoiding military conscription may constitute "persecution" only if the applicant shows either (1) the penalty imposed would be disproportionately severe on account of a protected ground, or (2) the applicant would be required to engage in inhumane conduct as part of military service. *Arbabian v. I.N.S.*, 995 F.2d 222, 1993 WL 209978, at *1

No. 13-60362

(5th Cir. June 4, 1993) (unpublished) (citing *Alonzo v. INS*, 915 F.2d 546, 548 (9th Cir. 1990); *Barraza Rivera v. INS*, 913 F.2d 1443, 1451 (9th Cir. 1990)).[4]

We have consistently reached this conclusion in unpublished opinions,[5] and after careful consideration, we reach the same conclusion here. We are guided by the Supreme Court's decision in analogous circumstances in *Elias–Zacarias*, and we are persuaded by the decisions of our sister circuits and the BIA on similar facts. In *Elias–Zacarias*, the "principal question presented . . . [was] whether a guerilla organization's attempt to coerce a person into performing military service *necessarily* constitutes 'persecution on account of . . . political opinion.'" 502 U.S. at 479. There, guerrillas invaded the home of Elias–Zacarias in Guatemala, their faces masked by bandanas, and harangued Elias–Zacarias and his parents to get him to join them in their war against the Guatemalan government. The guerrillas eventually left, but they told Elias–Zacarias that they would be back and he should think it over. Elias–Zacarias

---

[4] We decline Milat's invitation to decide whether Eritrean National Service is, as a general matter, illegitimate human trafficking. *Cf. M.A. v. U.S. I.N.S.*, 899 F.2d 304, 312 (4th Cir.1990) (en banc) ("International law and Board precedent are very clear that a sovereign nation enjoys the right to enforce its laws of conscription, and the penalties for evasion are not considered persecution."). We instead analyze his petition under the standards applied by the BIA and our sister circuits.

[5] *See, e.g.*, *Gebregergish v. Holder*, 538 F. App'x 582, 583 (5th Cir. Aug. 16, 2013) (per curiam) ("'International law and Board precedent are very clear that a sovereign nation enjoys the right to enforce its laws of conscription, and the penalties for evasion are not considered persecution.' Gebregergish thus cannot establish past persecution based on the punishment he received for refusing to accept transfer to the Army. Neither has Gebregergish established that his fear of future persecution based on his military desertion and pursuit of asylum will support the relief he seeks." (citations and footnote omitted)); *Paz-Caballero v. I.N.S.*, 47 F.3d 427, 1995 WL 71383, at *2 (5th Cir. Feb. 2, 1995) (unpublished) ("Conscription, without more, is not persecution under the [INA]. International law and Board precedent are very clear that a sovereign nation enjoys the right to enforce its laws of conscription, and the penalties for evasion are not considered persecution." (internal quotation marks omitted)); *Arbabian*, 1993 WL 209978, at *1 ("Prosecution for failure to perform compulsory military service is not persecution, unless 1) the petitioner would be subjected to disproportionately severe punishment on account of political views or 2) the service would have compelled the petitioner to perform inhumane acts outside the ordinary course of war.").

did not want to join because he feared the government would retaliate, and he fled. The Ninth Circuit held "acts of conscription by a nongovernmental group constitute persecution on account of political opinion," and Elias–Zacarias had a well-founded fear of conscription and, therefore, persecution. *Id.* at 480. The Supreme Court reversed.

The Court explained that the fact "the guerillas seek to fill their ranks . . . [to] pursue their political goals . . . does not render the forced recruitment 'persecution on account of . . . political opinion.'" *Id.* at 482. An applicant for asylum fleeing conscription "still has to establish that the record . . . compels the conclusion that he has a 'well-founded fear' that the guerrillas will persecute him *because of* that political opinion, rather than because of his refusal to fight with them." *Id.* at 483. Because Elias–Zacarias sought judicial reversal of the BIA's determination denying asylum, the Court ruled "he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution. That he has not done." *Id.* at 483–84. Thus, under *Elias–Zacarias*, Milat's argument that "any punishment for escape [from conscription]. . . would be persecution" is therefore unavailing. A fear of persecution based only on a refusal to be conscripted into military service is not sufficient. Milat must show that he fears persecution from the Eritrean government *because of* his political opinion, rather than because of his refusal to serve.

Our sister circuits have concluded that an asylum applicant's fear of punishment for evading military service establishes a well-founded fear of persecution in only two circumstances: the applicant must either establish that he would face disproportionate and severe punishment for refusing to serve on account of a protected ground, or that military service will necessarily require

the applicant to participate in inhumane conduct.[6]   The Ninth Circuit's decision in *Zehayte v. Gonzales* is illustrative.  453 F.3d 1182 (9th Cir. 2006). There, Zehayte, an Eritrean national, entered the United States and sought asylum.  Zehayte appealed the IJ's decision denying her asylum application. Zehayte made arguments similar to Milat's here.  She argued, *inter alia*, that she had a well-founded fear of persecution "because she refused to serve in the

---

[6] *See, e.g.*, *Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1346 (11th Cir. 2008) (rejecting argument that the asylum applicant had "established a well-founded fear of persecution based on the reasonable possibility of forced service in the Eritrean military" because the applicant "had to prove either that he would be disproportionately punished for refusing to serve in the Eritrean military or that he would be forced to join an internationally condemned military."); *Ghebrehiwot v. Att'y Gen. of U.S.*, 467 F.3d 344, 355 n.11 (3d Cir. 2006) ("[T]hose who violate laws governing . . . military conscription . . . do not merit asylum based on their fear of punishment for the crime that they committed." (internal quotation marks omitted) (second and third alterations in original)); *Habtemicael v. Ashcroft*, 370 F.3d 774, 780 (8th Cir. 2004) ("The immigration judge found that any adverse action which might be taken against Habtemicael by the Eritrean government would be on account of his desertion from the EPLF and the deaths of its soldiers, not on account of his politics.  While Habtemicael might indeed be punished or conscripted for his failure to contribute money to the Eritrean government, that could not form the basis of an asylum claim because his failure to make payments did not by itself express a political opinion.  If he were conscripted, it would be because he had not completed his military service requirement rather than because of his political beliefs.  Our review of the record shows that the immigration judge's finding that Habtemicael has no well founded fear of future persecution on the basis of his political beliefs is supported by substantial evidence."); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 (1st Cir. 2004) ("[A] sovereign nation enjoys the right to enforce its laws of conscription, and normal penalties for evasion generally are not considered persecution[;] two types of asylum claims can arise based on avoidance of military service.  First, an alien may be eligible for asylum if 'refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment on account of one of the five grounds enumerated in the [INA].'  Second, an alien is eligible for asylum if 'the alien would be associated with a military whose acts are condemned by the international community as contrary to the basic rules of human conduct.'" (footnote and citations omitted)); *M.A. v. U.S. I.N.S.*, 899 F.2d 304, 312 (4th Cir. 1990) (en banc) ("International law and Board precedent are very clear that a sovereign nation enjoys the right to enforce its laws of conscription, and that penalties for evasion are not considered persecution.  The Board also properly acknowledged that an exception to this rule will be recognized and an alien will be considered eligible for asylum in those rare cases in which either (1) the alien would be associated with a military whose acts are condemned by the international community as contrary to the basic rules of human conduct, or (2) refusal to serve in the military results not in normal draft evasion penalties, but rather in disproportionately severe punishment on account of one of the five grounds enumerated in section 1101(a)(42)(A) of the [INA]." (footnote and citations omitted)).

military, [and] she will be persecuted if she is forced to return to Eritrea." *Id.* at 1186. Like Milat, Zehayte was conscripted into the Eritrean National Service and was assigned to the army, and she fled the country to evade conscription. Zehayte claimed that as a Jehovah's Witness, her religious beliefs forbade her from serving in the military. The Ninth Circuit rejected these arguments and denied Zahayte's petition for review. The court explained "forced conscription or punishment for evasion of military duty generally does not constitute persecution." *Id.* at 1187. Further, the court held Zehayte's circumstances did not "fit within the exceptions to this rule." *Id.* The court explained Zehayte did not present evidence that she would have been required to participate in activities "internationally condemned [as] inhumane," or that "she would be singled out for severe disproportionate punishment for refusing to serve in the Eritrean military." *Id.* at 1187–88. We reached the same conclusion in our unpublished opinion in *Paz-Caballero* for the same reasons. 1995 WL 71383, at *2–4 (holding "[c]onscription, without more, is not persecution under the [INA]," and denying petition for review in part because "Paz-Caballero has made no showing that he was singled out for any [reason other than his potential as an effective soldier]").

Applying this rule, we conclude that the IJ's decision denying Milat's application for asylum was supported by substantial evidence. Although the evidence is conflicting,[7] the State Department report suggests that evasion of Eritrean National Service obligations generally results in brief detentions. *See Rojas*, 937 F.2d at 190 n.1 (noting that reports from the State Department are "the most appropriate and perhaps the best resource . . . to obtain information on political situations in foreign nations"). Moreover, Milat does not point to any direct evidence that he would be singled out and disproportionately

---

[7] Some evidence in the record suggests that the Eritrean government subjects the country's citizens to inhumane treatment for evading the National Service.

punished for evading conscription on account of his political views. The IJ and BIA could have reasonable concluded based on the evidence that officials at the Ministry of Defense did not know about his political inclinations. He did not speak with his mother or other family members about why the police came to the family home. He could only speculate as to whether his former supervisor, Lieutenant Colonel Asperom, reported him to the authorities for his political cartoon critical of the government's decision to close Asmara University. Nor does he indicate that his request for a reassignment within the National Service itself would be viewed as an expression of political opposition to the government.

Moreover, Milat admitted on cross-examination that the Eritrean government repeatedly furnished him with travel documents, his university certificate, and other information after he had fled the country. This evidence tends to undermine his argument that the Eritrean government views him as a political opponent. Without evidence that the Eritrean government knew of his political opinions or that the government may have imputed some political opinion to him due to his desire for a reassignment within the National Service, the IJ and the BIA reasonably concluded Milat had not shown that any persecution would be *because of* his political opinions. *See Elias–Zacarias*, 502 U.S. at 483 (holding that an applicant for asylum fleeing conscription "still has to establish that the record . . . compels the conclusion that he has a 'well-founded fear' that the guerrillas will persecute him *because of* that political opinion, rather than because of his refusal to fight with them."). Further, Milat's testimony indicated that he was not personally required to participate in any inhumane activities as a journalist at the Ministry of Defense, nor did he establish that he would be required to perform inhumane activities were he to return.

Therefore, the record on which the BIA rendered its decision does not compel a finding that Milat either was persecuted on account of his political opinion, or that he has a well-founded fear that he would be persecuted on account of his political beliefs were he to return to Eritrea. *See Chen*, 470 F.3d at 1134. Milat therefore has failed to show that he is entitled to asylum. Because Milat is not entitled to asylum, he also is not entitled to withholding of removal. *See Orellana–Monson*, 685 F.3d at 518.

## B.    Motion to Remand

Milat argues the BIA abused its discretion in denying his motion to remand his case to the IJ for rehearing based on the following new evidence: the United Nations 2000 Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime; the State Department's 2012 Trafficking in Persons Report; the State Department's 2011 Country Report on Human Rights Practices; the United Nations 1967 International Covenant on Civil and Political Rights; the 2012 report of the U.S. Commission on International Religious Freedom; the 2011 report of the United Nations High Commissioner for Refugees ("UNHCR") providing guidelines for assessing the protective needs of asylum seekers from Eritrea; the Department of Labor's 2010 and 2009 Findings on the Worst Forms of Child Labor; and a United Nations Security Council resolution from December 2011 condemning Eritrea for its aggression as to neighboring Djibouti.

We review the denial of a motion to remand "under a highly deferential abuse-of-discretion standard." *See Zhao v. Gonzales*, 404 F.3d 295, 303 (5th Cir. 2005); *Wang v. Ashcroft*, 260 F.3d 448, 451–52 (5th Cir. 2001) (explaining that a motion to remand for the consideration of new evidence is considered to be the same in substance as a motion to reopen a removal proceeding). This Court will affirm this decision "so long as it is not capricious, racially invidious,

utterly without foundation in the evidence, or otherwise so irrational that it is arbitrary rather than the result of any perceptible rational approach." *Zhao*, 404 F.3d at 304 (citation and internal quotations marks omitted). "A motion to [remand for new evidence] shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing . . . ." 8 C.F.R. § 1003.2(c)(1); *see also Matter of Ige,* 20 I. & N. Dec. 880, 883 (BIA 1994).

Here, the United Nations documents from 1967 and 1980 were available when Milat's case was before the IJ and could have been presented then. Those documents could not serve as a basis for a remand. *See* 8 C.F.R. § 1003.2(c)(1). The State Department's documents from 2011 and 2012 cover similar material but paint a darker picture of Eritrea than the 2008 report does. The UNHCR report describes the National Service program and the steep penalties for evasion, penalties that include "detention for long periods often in inhumane conditions, torture and forced labour." The report also notes the grounds for seeking asylum under the INA and states that "[i]n practice, the punishment for desertion or evasion is so severe and disproportionate such as to amount to persecution." The report further states that "[r]efusal to perform national service may be regarded by the Eritrean authorities as an expression of political opposition to the Government," and that "[p]ersons who evade or desert military service may be regarded as disloyal and treasonous towards the Government, and therefore punished for their perceived disloyalty."

These documents tend to suggest that the Eritrean National Service is a hybrid of traditional military conscription and a system of forced labor akin to slavery. However, the documents on which the BIA rendered its decision denying asylum also suggested this, though to a lesser degree. Moreover, the documents do not establish that Milat would have had any political opinions imputed to him beyond possibly a general opposition to the Eritrean

17

government based on his escape from the country to avoid the National Service. Additionally, Milat was granted relief under the CAT. Thus, the apparently increased possibility of torture were he to be returned to Eritrea was no longer an issue when the BIA was considering whether to remand the case because Milat will not be going back to Eritrea.[8] Thus, the denial of the motion for remand was not arbitrary or irrational based on the record before the BIA at the time it denied the motion. *See Zhao*, 404 F.3d at 304.

## IV.   CONCLUSION

We recognize that the evidence indicates the practices of the Eritrean government in enforcing its program of National Service are coercive and disturbing. We also note that some of the evidence submitted in support of Milat's motion for remand indicates that refusal to participate in National Service may be imputed as political opposition to the Government. On this record, however, we cannot say the IJ's finding was unsupported by substantial evidence, nor can we say the BIA's denial of Milat's motion for remand was irrational or arbitrary. Therefore, Milat's PETITION IS DENIED.

---

[8] Milat filed a letter under Federal Rule of Appellate Procedure 28(j) to notify the Court of the BIA's decision in *Gebrengus*; however, Milat's reliance on *Gebrengus* is misplaced because that decision is distinguishable. In *Gebrengus*, the petitioner was conscripted into the National Service in the eleventh grade. When he declined, he was taken to a detention camp, where he was held in a cell and poorly fed. He fled after five days and ultimately made his way to the United States. He was denied asylum, withholding of removal, and relief under the CAT. On appeal to the BIA, the petitioner submitted a 2012 trafficking report and a 2012 religious freedom report, which the petitioner argued "demonstrate that the national service program is essentially involuntary servitude." The BIA granted the motion for remand "[i]n light of this additional evidence about current country conditions."

Unlike Milat the petitioner in *Gebrengus* was denied asylum, withholding of removal, *and* protection under the Convention Against Torture, and the BIA remanded for consideration to decide whether the petitioner might be entitled to relief under the CAT, among other issues. In contrast, here, Milat received protection under the CAT. Further, the petitioner in *Gebrengus* refused to participate in National Service at all, whereas Milat merely sought reassignment from one branch of National Service to another before he fled the country. Thus, Milat and the petitioner in *Gebrengus* were not identically situated, and *Gebrengus* does not render the denial of Milat's motion for remand irrational or arbitrary so as to constitute an abuse of discretion. *See Zhao*, 404 F.3d at 304.