# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 12, 2020

Lyle W. Cayce
Clerk

No. 19-60758
Summary Calendar

FIDENCIO MUNOZ-GRANADOS, also known as Fidencio Munoz,

Petitioner

v.

WILLIAM P. BARR, U. S. ATTORNEY GENERAL,

Respondent

Petition for Review of an Order of the
Board of Immigration Appeals

Before SMITH, DENNIS, and DUNCAN, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Fidencio Munoz-Granados, a native and citizen of Mexico, petitions for review of the dismissal by the Board of Immigration Appeals (BIA) of his appeal from the order by the immigration judge (IJ) denying his applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). He also seeks review of the denial by the BIA of his motion to remand. We deny the petition.

I.

At his hearing before the IJ on December 20, 2017, Munoz-Granados testified that he came to the United States as a teenager in 2003. Several years

later, Munoz-Granados learned from his father, Jose Fidencio Munoz de Hoyos ("Jose"), who remained in Mexico as a flea market vendor and member of the Confederation of Mexican Workers, that a trio of unknown individuals had extorted and beat him around the time Munoz-Granados left for the United States. Jose paid the money and the threats ended. A similar event transpired in 2006. As before, Jose paid the demand to unidentified extortionists and the matter ended. Munoz-Granados then testified that around 2010 a drug cartel, Los Zetas, arrived in his home state of Coahuila. The Zetas began extorting 300 pesos per week from Jose as a quota for protection and the right to participate in the flea markets.[1] Jose's fellow flea market vendors received similar treatment. After learning about the situation, Munoz-Granados, who had become a construction worker in Louisiana, began sending money to his family in Mexico to help cover expenses.

At one point, around April 2014, the Zetas apparently beat Jose after he forgot to make his quota payments on time. According to Munoz-Granados, Jose responded by reporting the incident to the police,[2] after which the Zetas beat him again and destroyed his merchandise until another vendor interceded. Later, the Zetas told Jose they forgave him but would kill the first of his sons to return to Mexico. At this point Munoz-Granados became worried for his family and, because he was afraid to return to Mexico, applied for asylum in the United States.

---

[1] Three hundred pesos was equivalent, in 2010, to approximately $24 USD. Munoz-Granados explained that his father worked six days per week, earning an average of 1200–2000 pesos per day. Thus, the quota represented approximately 3% of Jose's average weekly earnings.

[2] The record contains a copy of what Munoz-Granados identifies as Jose's police complaint, dated April 8, 2014. However, the complaint only recounts economic extortion that began six months prior and was carried out by unknown individuals. There is no mention of Los Zetas, missed payments, or a beating. To the contrary, the complaint indicates Jose "paid no attention" to the demands and consistently refused to make any payments.

Meanwhile, back in Coahuila, Jose continued making weekly payments to the Zetas for several more years until he died from long-term health issues on October 3, 2017. Munoz-Granados testified that his family stopped paying quotas to Los Zetas when Jose died and had not received any demands or threats since doing so. Nevertheless, Munoz-Granados stated that he remained afraid to return to Mexico because he believed the Zetas had identified him and would kill him. When asked by the IJ why he believed the Zetas would kill him upon his return to Mexico instead of extorting money from him, Munoz-Granados responded that the Zetas were mad at Jose for going to the police. When pressed about the possibility of settling elsewhere in Mexico, such as with his girlfriend's family in San Luis Potosí, Munoz-Granados testified that he believed the Zetas were "everywhere" in Mexico such that there were no places he could live safely. Munoz-Granados also explained that his construction skills would be useless in Mexico, so he would have little income. Even so, he clarified that fear, not making less money, was the more important reason he did not want to return to Mexico.

The IJ was "troubled" by inconsistencies between Munoz-Granados's testimony and the documentary evidence he submitted, but nevertheless found Munoz-Granados "marginally credible." The IJ then denied Munoz-Granados's applications for asylum and withholding of removal, but declined to rule on his application for voluntary departure. Munoz-Granados appealed to the BIA, which dismissed his appeal, denied his motion to remand, and granted his application for voluntary departure.

## II.

We review the BIA's decision and will consider the underlying decision of the IJ only if, as here, it influenced the BIA's decision. *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 348 (5th Cir. 2002). "We review [the BIA's] decision for substantial evidence and reverse only if the evidence is so compelling that no

reasonable fact finder could fail to find the petitioner statutorily eligible for relief." *Qorane v. Barr*, 919 F.3d 904, 909 (5th Cir. 2019), *cert. denied*, 140 S. Ct. 907 (2020) (internal quotation marks and citation omitted). "We review the BIA's conclusions of law *de novo*." *Ontunez-Tursios*, 303 F.3d at 348.

## III.

## A.

Munoz-Granados asserts that substantial evidence does not support the BIA's rulings on asylum, withholding of removal, and CAT protection. We disagree.

### i.

The Attorney General has discretion to grant asylum to an alien who is a "refugee." *Milat v. Holder*, 755 F.3d 354, 360 (5th Cir. 2014); *see* 8 U.S.C. § 1158(b)(1)(A). To qualify for asylum as a refugee, an applicant must demonstrate either past persecution or a reasonable, well-founded fear of future persecution on account of one of the five grounds enumerated in 8 U.S.C. § 1101(a)(42)(A), including, as relevant here, "membership in a particular social group."[3] *Milat*, 755 F.3d at 360; *see* 8 U.S.C. § 1158(b)(1)(B)(i). "Persecution is an extreme concept that does not include every sort of

---

[3] Munoz-Granados claims he experienced past persecution and has a well-founded fear of future persecution on account of membership in a particular social group composed of his father Jose's family. The BIA, citing *Matter of L-E-A-*, 27 I. & N. Dec. 581 (U.S. Att'y Gen. 2019), rejected this claim, holding that Jose's family was not a cognizable social group because there was no evidence "establishing that the respondent's father's family is socially distinct in the eyes of Mexican society." Munoz-Granados does not challenge the BIA's holding that his father's family fails to meet the standard set forth in *Matter of L-E-A-*. Instead, he contends the BIA erred by retroactively applying *Matter of L-E-A-* which, according to Munoz-Granados, "constituted a radical departure from what was, up to that point, a highly settled tenet of US asylum law." We are not so sure. As we recently explained, *L-E-A-* "is not at odds with any precedent in the Fifth Circuit." *Pena Oseguera v. Barr*, 936 F.3d 249, 251 (5th Cir. 2019). In any event, we need not and do not decide whether the BIA erred in applying the *L-E-A-* standard since even if Munoz-Granados's father's family was a cognizable social group, Munoz-Granados's claims would still fail because the alleged acts do not rise to the level of persecution.

treatment our society regards as offensive." *Arif v. Mukasey*, 509 F.3d 677, 680 (5th Cir. 2007) (cleaned up).

To prevail on a claim of *past* persecution, an alien must establish that he suffered persecution at the hands of "the government or forces that a government is unable or unwilling to control." *Tesfamichael v. Gonzales*, 469 F.3d 109, 113 (5th Cir. 2006). "Neither we nor the BIA has ever held that an alien can seek asylum based upon the alleged past-persecution of another." *Morales v. Sessions*, 860 F.3d 812, 816 (5th Cir. 2017).

The BIA determined that Munoz-Granados failed to establish that he suffered past persecution because, *inter alia*, the actions and threats directed at his family did not rise to the level of persecution. The evidence does not compel a contrary conclusion. Munoz-Granados mainly argues that he experienced past persecution when the Zetas threatened Jose that they would kill the first of Jose's sons to return to Mexico. But even assuming *arguendo* that Munoz-Granados could have experienced past persecution without having been present in Mexico, the alleged act does not rise to the level of persecution. We have explained that, "even assuming threats can constitute past persecution, threats that are 'exaggerated, non-specific, or lacking in immediacy' should not suffice." *Qorane*, 919 F.3d at 910 (quoting *Corado v. Ashcroft*, 384 F.3d 945, 947 (8th Cir. 2004) (per curiam)). Munoz-Granados was never directly threatened by his father's extortionists, and whatever indirect threats he experienced were too lacking in immediacy to constitute past persecution, insofar as the Zetas only threatened to kill him or his brother if one of them returned to Mexico, which neither of them did.

"To establish a well-founded fear of future persecution, an alien must demonstrate a subjective fear of persecution, and that fear must be objectively reasonable." *Zhao v. Gonzales*, 404 F.3d 295, 307 (5th Cir. 2005) (internal quotation marks and citation omitted). "[A] finding of a well-founded fear of

persecution is negated if the applicant can avoid persecution by relocating to another part of his home country." *Eduard v. Ashcroft*, 379 F.3d 182, 189 (5th Cir. 2004) (citing 8 C.F.R. § 208.13(b)(2)(ii)). When there is no showing of past persecution, petitioner bears the burden to establish that relocation is unreasonable, unless the persecution is by a government or is government-sponsored. *Id.* at 194 (citing 8 C.F.R. § 208.13(b)(3)(i)).

The BIA concluded that Munoz-Granados failed to establish a well-founded fear of future persecution because Jose's extortionists had not harmed, threatened, or made demands of Munoz-Granados's mother and siblings since Jose passed away and, further, because Munoz-Granados had not established that he would be unable to avoid his father's extortionists by relocating to a different part of Mexico. Again, the evidence does not compel a contrary conclusion. Munoz-Granados testified that Jose made weekly payments to the Zetas starting in 2010, and that in 2014 the Zetas beat Jose the one time he was late in making payments. Yet Munoz-Granados stated that his family stopped making payments altogether in 2017 when Jose died and had received no demands or threats in the 3 months between Jose's death and Munoz-Granados's hearing before the IJ. This weakens Munoz-Granados's claim of likely future persecution. *See Eduard*, 379 F.3d at 193 (citing *Matter of A-E-M-*, 21 I. & N. Dec. 1157, 1160 (BIA 1998)).

More importantly, Munoz-Granados failed to meet his burden to establish that it would be unreasonable for him to relocate to another part of Mexico, away from his father's extortionists. *See id.* at 193–94 (holding any BIA errors concerning fear of future persecution "are harmless if Petitioners could safely relocate within [Petitioners' country]"). As both the IJ and BIA acknowledged, Munoz-Granados's sole basis for claiming he could not reasonably relocate to another part of Mexico was his belief that the Zetas are "everywhere." This is not enough. First of all, Munoz-Granados himself

conceded that "the Zetas are not as prominent in some parts of Mexico." Second, while we do not question whether Los Zetas remains a forceful criminal enterprise, a fear of general violence and civil disorder is not sufficient to support a fear of future persecution. *Id.* at 190.

## ii.

To qualify for withholding of removal, an alien "must demonstrate a clear probability of persecution upon return." *Roy v. Ashcroft*, 389 F.3d 132, 138 (5th Cir. 2004) (internal quotation marks and citation omitted). As "[w]ithholding of removal is a higher standard than asylum," one who fails to show entitlement to asylum fails to show entitlement to withholding of removal. *Efe v. Ashcroft*, 293 F.3d 899, 906 (5th Cir. 2002). Because substantial evidence supports the BIA's finding that Munoz-Granados failed to meet his burden for asylum, he has also failed to carry his burden for withholding of removal. *See Orellana-Monson v. Holder*, 685 F.3d 511, 518 (5th Cir. 2012).

## iii.

"For a petitioner to be entitled to CAT relief, he or she must show that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Garcia v. Holder*, 756 F.3d 885, 891 (5th Cir. 2014) (citing 8 C.F.R. § 208.16(c)(2)). "Torture includes only pain or suffering inflicted by or with the consent or acquiescence of a public official or other person acting in an official capacity." *Qorane*, 919 F.3d at 911 (cleaned up) (quoting 8 C.F.R. § 208.18(a)(1)).

The BIA affirmed the IJ's determination that Munoz-Granados did not establish eligibility for CAT protection. Once more, the record does not compel a different conclusion. For one thing, because the actions and threats discussed above do not even rise to the level of persecution, "[i]t follows *a fortiori* they do not constitute torture." *Id.* Moreover, Munoz-Granados fails to show that the Zetas—to the extent they torture others in Mexico—do so with the

acquiescence of public officials. *See id.* ("[A] government's inability to protect its citizens does not amount to acquiescence.").

In sum, substantial evidence supports the BIA's rulings on asylum, withholding, and eligibility for CAT protection.

## B.

Munoz-Granados devotes the bulk of his opening brief to arguing that the BIA erred by determining his defective Notice to Appear (NTA), which lacked certain required information, was cured by a subsequent Notice of Hearing containing the missing information, thus triggering the "stop-time" rule for cancellation of removal. Various amici join Munoz-Granados in pressing this claim. As Munoz-Granados now concedes, however, this argument has been foreclosed by *Yanez-Pena v. Barr*, 952 F.3d 239, 241 (5th Cir. Feb. 28, 2020) (holding that "(1) the information statutorily required to be contained in an NTA may be supplied in more than one document, and (2) an NTA is perfected, and the stop-time rule is triggered, when the alien receives all required information, whether in one document or more"), *petition for cert. filed* (U.S. Apr. 10, 2020) (No. 19-1208). Accordingly, the BIA did not err in determining that the Notice of Hearing triggered the stop-time rule.

## C.

Lastly, Munoz-Granados claims the BIA engaged in impermissible factfinding by adjudicating—and granting—his request for voluntary departure, rather than remanding the matter to the IJ. But even if the BIA so erred, the error would be harmless. Had the BIA remanded the matter to the IJ, and had the IJ granted Munoz-Granados's application for voluntary departure, that grant—just like the BIA's grant—would have automatically terminated upon Munoz-Granados's filing the present petition for review. *See* 8 C.F.R. § 1240.26(i).

\* \* \*

Accordingly, Munoz-Granados's petition for review is DENIED.